CARL IVES, Respondent, v. THE SOUTH BUFFALO RAILWAY COMPANY, Appellant.

Constitutional law — Labor Law — provision relating to "workmen's compensation in certain dangerous employments" (L. 1910, ch. 674) void under Federal and State Constitutions — legislation under police power of state, constitutional limitations and restrictions thereon.

The Federal and State Constitutions are the charters which demark the extent and the limitations of legislative power, and under our form of government courts must regard all economic, philosophical and moral theories, attractive and desirable though they may be, as subordinate to the primary question whether they can be moulded into statutes without infringing upon the letter or spirit of our written Constitutions.

The " fellow-servant" doctrine is one of judicial origin engrafted upon the common law for the protection of the master against the consequences of negligence in which he has no part. The law of contributory negligence is the natural outgrowth of any system of jurisprudence in which the fault of one is the basis of liability for injury to another. Hence it is within the scope of legislative power to change or abolish either or both.

Under the common law the employee was held to have assumed the ordinary and obvious risks incident to the employment as well as the special risks arising out of dangerous conditions which were known and appreciated by him. In the Labor Law and Employers' Liability Act, which define the risks assumed by the employee, there are many provisions which cast upon the employer a great variety of duties and burdens unknown to the common law. These can doubtless be still further multiplied and extended to the point where they deprive the employer of rights guaranteed to him by our Constitutions, and there they must stop.

The liability sought to be imposed by the act under consideration is based upon the nature of the employment and not upon the legal status of the employer. It is, therefore, unnecessary to decide how far corporate liability may be extended under the reserved power to alter or amend charters, except as that question may be incidentally discussed in considering the police power of the state.

Classification for purposes of taxation or of regulation under the police power is a legislative function with which the courts have no right to interfere unless it is so clearly arbitrary or unreasonable as to invade some constitutional right. A state may classify persons and objects for the purpose of legislation prov'ded the classification is based on proper and justifiable distinctions ard for a purpose within the legisla-

tive power, and that is the effect of the classification in this statute of certain employments as dangerous.

So far as the statute merely creates a new remedy in addition to those which existed before it is not invalid. The state has complete control over the remedies which it offers to suitors in its courts even to the point of making them applicable to rights or equities already in existence, and it may change the common law and the statutes so as to create duties and liabilities which never existed before. But in its basic and vital features the right given to the employee by this statute does not preserve to the employer the "due process" of law guaranteed by the Constitutions, for it authorizes the taking of the employer's property without his consent and without his fault.

No employer can be compelled to assume a risk which is inseparable from the work of the employee, and which may exist in spite of a degree of care by the employer far greater than may be exacted by the most drastic law. It is not competent to impose upon an employer, who has omitted no legal duty and has committed no wrong, a liability based solely upon a legislative determination that his business is inherently dangerous. In so far as article 14-a of the Labor Law (L. 1910, ch. 674) imposes such a liability, it is void under the fourteenth amendment to the Federal Constitution and under section 6 of article 1 of our State Constitution, which guarantees all persons against deprivation of life, liberty or property without due process of law.

In order to sustain legislation under the police power the courts must be able to see that its operation tends in some degree to prevent some offense or evil, or to preserve public health, morals, safety and welfare. If it discloses no such purpose, but is clearly calculated to invade the liberty and property of private citizens, it is the duty of the courts to declare it invalid, for legislative assumption of the right to direct the channel into which the private energies of the citizen may flow, or legislative attempt to abridge or hamper the right of the citizen to pursue, unmolested and without unreasonable regulation, any lawful calling or avocation which he may choose, has always been condemned under our form of government. ·

·Authorities as to exercise of the police power collated, considered, criticised and distinguished, and *held*, that since the Constitution forbids that a citizen shall be penalized or subjected to liability unless he has violated some law or has been guilty of some fault, the act cannot be sustained as a legislative exercise of the police power.

*Ives* v. *South Buffalo Ry. Co.*, 140 App. Div. 921, reversed.

(Argued January 16, 1911; decided March 24, 1911.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered October 25, 1910, which affirmed a final judgment in favor of

plaintiff entered upon a decision of the court at Special Term sustaining a demurrer to the answer.

This is an action brought by an employee against his employer to recover compensation under article 14-a of the Labor Law, being chapter 674 of the Laws of 1910, entitled "An act to amend the labor law, in relation to workmen's compensation in certain dangerous employments."

The complaint alleges, in substance, that on the second day of September, 1910, while the plaintiff was engaged in his work as a switchman on defendant's steam railroad, he was injured solely by reason of a necessary risk or danger of his employment; that at the time of the commencement of the action he had been totally incapacitated for labor for a period of three weeks, and that such incapacity would continue for four weeks longer, and demands judgment for compensation in accordance with the provisions of said act for a period of five weeks. The answer, after admitting all the allegations of the complaint, pleads as a defense the unconstitutionality of article 14-a of the Labor Law, upon the ground that it contravenes certain provisions of the Federal and State Constitutions. The plaintiff demurred to this defense on the ground that it was insufficient in law upon the face thereof. The issue of law thus presented was tried at Special Term, where the demurrer was sustained. Final judgment was entered upon this decision, and the defendant appealed to the Appellate Division, where the judgment was affirmed by a divided court.

This statute which has been added to the Labor Law is known as article 14-a thereof, and consists of twelve sections, which we quote in full. The question presented upon this appeal is whether it is repugnant to any of the provisions of the Federal and State Constitutions invoked by the defendant.

"WORKMEN'S COMPENSATION IN CERTAIN DANGEROUS EMPLOYMENTS.

"§ 215. Application of article.— This article shall apply only to workmen engaged in manual or mechanical labor in

the following employments, each of which is hereby determined to be especially dangerous, in which from the nature, conditions or means of prosecution of the work therein, extraordinary risks to the life and limb of workmen engaged therein are inherent, necessary or substantially unavoidable, and as to each of which employments it is deemed necessary to establish a new system of compensation for accidents to workmen.

"1. The erection or demolition of any bridge or building in which there is, or in which the plans and specifications require, iron or steel frame work.

"2. The operation of elevators, elevating machines or derricks or hoisting apparatus used within or on the outside of any bridge or building for the conveying of materials in connection with the erection or demolition of such bridge or building.

"3. Work on scaffolds of any kind elevated twenty feet or more above the ground, water, or floor beneath in the erection, construction, painting, alteration or repair of buildings, bridges or structures.

"4. Construction, operation, alteration or repair of wires, cables, switchboards or apparatus charged with electric currents.

"5. All work necessitating dangerous proximity to gunpowder, blasting powder, dynamite or any other explosives, where the same are used as instrumentalities of the industry.

"6. The operation on steam railroads of locomotives, engines, trains, motors or cars propelled by gravity or steam, electricity or other mechanical power, or the construction or repair of steam railroad tracks and road beds over which such locomotives, engines, trains, motors or cars are operated.

"7. The construction of tunnels and subways.

"8. All work carried on under compressed air.

"§ 216. Definitions.— The words, 'employer,' 'workman' and 'employment,' or their plurals, used in this article, shall be construed to apply to all the employments above described.

"§ 217. Basis of liability.— If, in the course of any of the

employments above described, personal injury by accident arising out of and in the course of the employment after this article takes effect is caused to any workman employed therein, in whole or in part, or the damage or injury caused thereby is in whole or part contributed to by

"a. A necessary risk or danger of the employment or one inherent in the nature thereof; or

"b. Failure of the employer of such workmen or any of his or its officers, agents or employees to exercise due care, or to comply with any law affecting such employment; then such employer shall, subject as hereinafter mentioned, be liable to pay compensation at the rates set out in section two hundred and nineteen-a of this title; provided that the employer shall not be liable in respect of any injury which does not disable the workman for a period of at least two weeks from earning full wages at the work at which he was employed, and provided that the employer shall not be liable in respect of any injury to the workman which is caused in whole or in part by the serious and willful misconduct of the workman.

"§ 218. Rights of action not affected.— The right of action for damages caused by any such injury, at common law or under any statute in force on January one, nineteen hundred and ten, shall not be affected by this article, and every existing right of action for negligence or to recover damages for injuries resulting in death is continued, and nothing in this article shall be construed as limiting such right of action, but in case the injured workman, or in event of his death his executor or administrator, shall avail himself of this article, either by accepting any compensation hereunder in accordance with section two hundred and nineteen-a hereof, or by beginning proceedings therefor in any manner on account of any such injury, he shall be barred from recovery in and deemed thereby to have released every other action at common law or under any other statute on account of the same injury after this article takes effect. In case after such injury the workman, or in the event of his death his executor or administrator, shall commence any action at common law or under

any statute other than this article against the employer therefor he shall be barred from all benefit of this article in regard thereto.

"§ 219. Notice of accident.—No proceedings for compensation under this article shall be maintained unless notice of the accident as hereinafter provided has been given to the employer as soon as practicable after the happening thereof and before the workman has voluntarily left the employment in which he was injured, and during such disability, but no want or defect or inaccuracy of a notice shall be a bar to the maintenance of proceedings unless the employer proves that he is prejudiced by such want, defect or inaccuracy. Notice of the accident shall state the name and address of the workman injured, the date and place of the accident, and in simple language the physical cause thereof, if known. The notice may be served personally or by sending it by mail in a registered letter addressed to the employer at his last known residence or place of business.

"§ 219-a. Scale of compensation.— The amount of compensation shall be in case death results from injury:

"a. If the workman leaves a widow or next of kin at the time of his death wholly dependent on his earnings, a sum equal to twelve hundred times the daily earnings of such workman at the rate at which he was being paid by such employer at the time of the injury subject as hereinafter provided, and in no event more than three thousand dollars. Any weekly payments made under this article shall be deducted in ascertaining such amount.

"b. If such widow or next of kin at the time of his death are in part only dependent upon his earnings, such proportionate sum not exceeding that provided in subdivision a as may be determined according to the injury to such dependents.

"c. If he leaves no dependents, the reasonable expenses of his medical attendance and burial, not exceeding one hundred dollars.

"Whatever sum may be determined to be payable under this article in case of death of the injured workman shall be

paid to his legal representative for the benefit of such dependents, or if he leaves no · such dependents, for the benefit of the persons to whom the expenses of medical attendance and burial are due.

" 2. Where total or partial incapacity for work at any gainful employment results to the workman from the injury, a weekly payment commencing at the end of the second week after the injury and continuing during such incapacity, subject as herein provided, equal to fifty per centum of his average weekly earnings when at work on full time during the preceding year during which he shall have been in the employment of the same employer, or if he shall have been in the employment of the same employer for less than a year, then a weekly payment of not exceeding three times the average daily earnings on full time for such less period. In fixing the amount of the weekly payment, regard shall be had to the difference between the amount of the average earnings of the workman before the accident and the average amount he is able to earn thereafter as wages in the same employment or otherwise. In fixing the amount of the weekly payment, regard shall be had to any payment, allowance or benefit which the workman may have received from the employer during the period of his incapacity, and in the case of partial incapacity the weekly payment shall in no case exceed the difference between the amount of the average weekly earnings of the workman before the accident and the average weekly amount which he is earning or is able to earn in the same employment or otherwise after the accident, but shall amount to one-half of such difference. *In no event shall any compensation paid under this article exceed the damage suffered, nor shall any weekly payment payable under this article in any event exceed ten dollars a week or extend over more than eight years from the date of the accident.*

" § 219-b. Medical examinations.—Any workman entitled to receive weekly payments under this article is required, if requested by the employer, to submit himself for examination by a duly qualified medical practitioner or surgeon provided

and paid for by the employer, at a time and place reasonably convenient for the workman, within three weeks after the injury, and thereafter at intervals not oftener than once in six weeks. If the workman refuses to submit to such examination, or obstructs the same, his right to weekly payments shall be suspended until such examination has taken place, and no compensation shall be payable during or for account of such period.

" § 219-c. *Incompetency of workman.*— In case an injured workman shall be mentally incompetent at the time when any right or privilege accrues to him under this article, a committee or guardian of the incompetent appointed pursuant to law may, on behalf of such incompetent, claim and exercise any such right or privilege with the same force and effect as if the workman himself had been competent and had claimed or exercised any such right or privilege; and no limitation of time in this article provided for shall run so long as said incompetent workman has no committee or guardian.

" § 219-d. *Settlement of disputes.*— Any question which may arise under this act shall be determined either by agreement or by arbitration as provided in the Code of Civil Procedure or by an action at law as herein provided. In case the employer fail to make compensation as herein provided, the injured workman, or his committee or guardian, if such be appointed, or his executor or administrator, may then bring an action to recover compensation under this article in any court having jurisdiction thereof, or in any court which would have had jurisdiction of an action for recovery of damages for negligence for the same injury between the same parties. This article however shall not be construed as extending the jurisdiction of any such court to award judgment for an amount greater than now allowed by law. Such action shall be conducted in the same manner as actions at law for the recovery of damages for negligence. The judgment in such action if in favor of the plaintiff shall be for a sum equal to the amount of payments then due and prospectively due under this article. Such action must be com-

menced within six months after the happening of the accident or in case of the death of the workman by such accident within six months after the appointment of his legal representative in this state, or in the event of his physical incapacity, within six months after the removal thereof, or in the event of weekly payments by the employer hereunder, within six months after such payments have ceased. In such action by an executor or administrator the judgment may provide the proportions of the award or the costs to be distributed to or between the several dependents. If such determination is not made it shall be determined by the Surrogate's Court, in which such executor or administrator is appointed, in accordance with this article, on petition of any party interested on such notice as such court may direct.

" § 219-e. Preferences and exemptions.— Any person entitled to weekly payments under this article against any employer shall have the same preferential claim therefor against the assets of the employer as allowed by law for a claim by such person against such employer for unpaid wages or personal services. Weekly payments due under this article shall not be assignable or subject to levy, execution or attachment.

" § 219-f. Attorneys' liens.— No claim of an attorney at law for any contingent interest in any recovery under this article for services in securing such recovery or for disbursements shall be an enforceable lien on such recovery, unless the amount of the same be approved in writing by a justice of the Supreme Court, or in case the same be tried in any court, by the justice presiding at such trial.

" § 219-g. Liability of principal contractors.— If an employer who shall be the principal enters into a contract with an independent contractor to do part of such employer's work, or if such contractor enters into a contract with a sub-contractor to do all or any part of the work comprised in such contractor's contract with the employer, the said principal shall be liable to pay to any workman employed in the execution of the work any compensation under this article which he would

have been liable to pay if that workman had been immediately employed by him; and where compensation is claimed from or proceedings are taken against the principal then, in the application of this article, references to the principal shall be substituted for references to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the workman under the contractor or employer by whom he is immediately employed. Where such principal is liable to pay compensation he shall be entitled to be indemnified by any person who would have been liable to pay compensation to the workman independently of this section. Nothing in this section shall be construed as preventing a workman from recovering compensation under this article from the contractor or sub-contractor, instead of the principal; nor shall this section apply in any case where the accident shall occur elsewhere than on, or in, or about the premises on which the principal has undertaken to execute the work or which are otherwise under his control or management."

*Louis Marshall, Charles B. Sears and Louis L. Babcock* for appellant. The constitutional guaranties against deprivation of liberty and property without due process of law, contained in both Federal and State Constitutions, are violated by this act. (*Colon* v. *Lisk*, 153 N. Y. 194; *Lochner* v. *New York*, 198 U. S. 64; *Boyd* v. *United States*, 116 U. S. 635; *People* v. *Gillson*, 109 N. Y. 389; *Slaughter House Cases*, 16 Wall. 36; *Matter of Jacobs*, 98 N. Y. 98; *People* v. *Marx*, 99 N. Y. 377; *People ex rel. Tyroler* v. *Warden of City Prison*, 157 N. Y. 116; *Fisher Co.* v. *Woods*, 187 N. Y. 90; *Adair* v. *United States*, 208 U. S. 161; *Bertholf* v. *O'Reilly*, 74 N. Y. 509.) Legislation of this character can in no event be justified under the taxing power, because that power can only be exercised for public as distinguished from private purposes, and the compensation of workmen for injuries sustained is essentially a private purpose. (1 Hare on Const. Law, 280, 284; *Loan Assn.* v. *Topeka*, 20 Wall. 655; *Weismer* v. *Vil. of Douglas*, 64 N. Y. 91; *W. K. I. Co.* v. *Milwaukee County*,

95 Wis. 133; *Lowell* v. *City of Boston*, 111 Mass. 454; *Lucas County* v. *State*, 75 Ohio St. 114; *Bush* v. *Bd. of Suprs.*, 159 N. Y. 212; *Oxnard B. S. Co.* v. *Nebraska*, 73 Neb. 57; *Matter of Bounties*, 186 Mass. 603; *M. S. Co.* v. *Dix*, 124 Mich. 674; *Matter of Chapman* v. *City of New York*, 168 N. Y. 80.) Neither is this legislation justified by a resort to the police power. (*Wright* v. *Hart*, 182 N. Y. 330; *Lawton* v. *Steele*, 152 U. S. 137; *Lochner* v. *New York*, 198 U. S. 45; *Holden* v. *Hardy*, 169 U. S. 366; *Matter of Jacobs*, 98 N. Y. 98; *People* v. *Gillson*, 109 N. Y. 389; *Forster* v. *Scott*, 136 N. Y. 577; *Colon* v. *Lisk*, 153 N. Y. 188; *People* v. *Hawkins*, 157 N. Y. 1; *Schnaier* v. *N. H. & I. Co.*, 182 N. Y. 83; *Beardsley* v. *N. Y., L. E. & W. R. R. Co.*, 162 N. Y. 230; *People* v. *Marcus*, 185 N. Y. 257; *People* v. *Williams*, 189 N. Y. 131.) This act cannot be justified as an exercise of the reserved power to alter and amend corporate charters. (*People* v. *O'Brien*, 111 N. Y. 1; *City of Detroit* v. *D. & F. Plankroad Co.*, 43 Mich. 140; *Shields* v. *Ohio*, 92 U. S. 319; Freund on Police Power, § 363; *L. S. & M. S. Ry. Co.* v. *Smith*, 173 U. S. 684; *Beardsley* v. *N. Y., L. E. & W. R. R. Co.*, 162 N. Y. 223; *Lord* v. *E. L. Assur. Society*, 194 N. Y. 227.) The guaranty of the Federal Constitution in relation to the equal protection of the laws is violated by this statute. (*People ex rel. Farrington* v. *Mensching*, 187 N. Y. 8; *Connolly* v. *U. S. P. Co.*, 184 U. S. 540; *Matter of Pell*, 171 N. Y. 48; *People* v. *O. C. R. C. Co.*, 175 N. Y. 84; *Ruhstrat* v. *People*, 185 Ill. 183; *People ex rel. McPike* v. *Van de Carr*, 91 App. Div. 20; 178 N. Y. 425; *Wright* v. *Hart*, 182 N. Y. 330; *People* v. *Beattie*, 96 App. Div. 383; *People ex rel. Appel* v. *Zimmerman*, 102 App. Div. 103; *Wadsworth* v. *U. P. Ry. Co.*, 18 Col. 600.) The constitutional guaranty in relation to trial by jury is violated by this statute. (*Callan* v. *Wilson*, 127 U. S. 540; *Thompson* v. *Utah*, 170 U. S. 343; *Clark* v. *City of Utica*, 18 Barb. 451; *People* v. *Sickles*, 156 N. Y. 541; *Colon* v. *Lisk*, 153 N. Y. 188; Cooley's Const. Lim. 453; *Wadsworth* v. *U. P. Ry. Co.*, 18 Col. 600; *East Kingston* v. *Towle*, 48 N. H. 57.)

*Julien T. Davies* and *Harold Harper* for New York Dock Company, intervening. The feature of the law that imposes upon the master a liability to pay compensation to a servant who is injured, irrespective of whether the master has violated any duty which he owes to the servant by statute or at the common law, is repugnant both to the Federal Constitution and the State Constitution as depriving the defendant and others coming within the purview of the statute of property without due process of law, and of the equal protection of the laws and of a jury trial. (*Marshall* v. *Marshall Sons Co.,* L. R. [App. Cas. 1906] 409 ; *Wilkinson* v. *Leland,* 2 Pet. 627 ; *O. & M. R. Co.* v. *Lackey,* 78 Ill. 55 ; *Camp* v. *Rogers,* 44 Conn. 291 ; *M. P. R. Co.* v. *Humes,* 115 U. S. 512 ; *M. & S. L. Ry. Co.* v. *Emmons,* 149 U. S. 364 ; *Suydam* v. *Moore,* 8 Barb. 358 ; *Quackenbush* v. *W. & M. R. R. Co.,* 62 Wis. 411 ; *D., etc., R. Co.* v. *Outcault,* 2 Col. App. 395 ; *Zeigler* v. *S. & N. A. R. R. Co.,* 58 Ala. 594.) The constitutional guaranties are also violated by the feature of the law which requires the master in the case of injury to the servant to pay, as compensatory damages, an amount fixed by statute, without affording the master opportunity to show what damage the servant has actually sustained. ( *Wynehamer* v. *People,* 13 N. Y. 378 ; *Colon* v. *Lisk,* 13 App. Div. 195 ; 153 N. Y. 188 ; *Wadsworth* v. *U. P. Co.,* 18 Col. 600 ; *East Kingston* v. *Towle,* 48 N. H. 57 ; *Fairchild* v. *Rich,* 68 Vt. 202.)

*Thomas C. Burke* for respondent. The act is within the police power of the state. (*C., R. I. & P. Ry. Co.* v. *Zernecke,* 183 U. S. 582 ; *Bertholf* v. *O'Reilly,* 74 N. Y. 509 ; *Ives* v. *S. B. Ry. Co.,* 68 Misc. Rep. 643 ; *Clark* v. *Foot,* 8 Johns. 421 ; *E. R. R. Co.* v. *R. Ins. Co.,* 98 Mass. 420 ; *G. T. Ry. Co.* v. *Richardson,* 91 U. S. 454 ; *Huntington* v. *Attrill,* 146 U. S. 657 ; *S. L. & S. F. R. Co.* v. *Mathews,* 165 U. S. 1 ; *People* v. *Luhrs,* 195 N. Y. 377 ; *People* v. *Lochner,* 177 N. Y. 145.) The act is within the reserved power of the legislalature to amend corporate charters. (*N. Y. C. & H. R.*

*R. R. Co.* v. *Williams*, 199 N. Y. 108 ; *C., R. I. & P. Ry. Co.* v. *Zernecke*, 183 U. S. 582 ; *Willcox* v. *C. G. Co.*, 212 U. S. 19.) The act does not deprive defendant of property without due process of law. (*Bertholf* v. *O'Reilly*, 74 N. Y. 509 ; *Dobbins* v. *United States*, 96 U. S. 395 ; *Priestley* v. *Fowler*, 3 M. & W. 1 ; *Farwell* v. *B., etc., R. R. Co.*, 4 Metc. 49 ; *Coon* v. *S. & U. R. R. Co.*, 5 N. Y. 492 ; *M. Ry. Co.* v. *Mackey*, 127 U. S. 205 ; *Employers' Liability Cases*, 207 U. S. 463 ; *Sherman* v. *R. & S. R. R. Co.*, 17 N. Y. 153 ; *St. L., I. M. & S. Ry. Co.* v. *Paul*, 173 U. S. 404 ; *Muller* v. *Oregon*, 208 U. S. 412.) The act does not deprive defendant of a trial by jury. (*C., R. I. & P. Ry. Co.* v. *Zernecke*, 59 Neb. 689.)

*Everett P. Wheeler* for Civic Federation, intervening. This act does not deny the equal protection of the law. (*Orient Ins. Co.* v. *Daggs*, 172 U. S. 557 ; *Magoon* v. *I. T. & S. Bank*, 170 U. S. 283 ; *M. P. R. R. Co.* v. *Mackey*, 127 U. S. 205.) The argument that it is a denial of due process of law to create a new right of action is untenable. (3 Black. Comm. [Browne's ed.] 464 ; Stephen on Pleading, 13, 33.)

*Joseph P. Cotton, Jr.*, intervening. The act does not violate the constitutional guaranties against deprivation of liberty and property without due process of law ; nor does it deny defendant and others the equal protection of the laws, nor the right to a jury trial in cases where a jury trial has formerly been allowed. (*S. L., etc., Ry. Co.* v. *Mathews*, 165 U. S. 1 ; *Holmes* v. *Murray*, 207 Mo. 413 ; *Bertholf* v. *O'Reilly*, 74 N. Y. 509 ; *Marvin* v. *Trout*, 199 U. S. 212 ; *C., etc., Ry. Co.* v. *Zernecke*, 183 U. S. 582 ; *P. & N. Y. R. R. Co.* v. *Hill*, 109 U. S. 578 ; *Heeg* v. *Licht*, 80 N. Y. 579 ; *Thomas* v. *Winchester*, 6 N. Y. 397.) The New York act of 1910 not only does not establish classifications which are palpably arbitrary, but that by it and under it extreme care was taken by the legislature to avoid practical as well as constitutional inequalities in the application of the statute.

(*L. & N. R. R. Co.* v. *Melton,* 218 U. S. 36; *Tullis* v. *L. E. & W. R. R. Co.,* 175 U. S. 348; *P., etc., R. Co.* v. *Ross,* 212 U. S. 560; *Magoun* v. *I. T. Co.,* 170 U. S. 294; *Orient Ins. Co.* v. *Daggs,* 172 U. S. 557; *Martin* v. *Pittsburg,* 203 U. S. 284; *S. Oil Co.* v. *Texas,* 217 U. S. 114.)

WERNER, J.   In 1909 the legislature passed a law (Chap. 518) providing for a commission of fourteen persons, six of whom were to be appointed by the governor, three by the president of the senate from the senate, and five by the speaker of the assembly from the assembly, " to make inquiry, examination and investigation into the working of the law in the State of New York relative to the liability of employers to employees for industrial accidents, and into the comparative efficiency, cost, justice, merits and defects of the laws of other industrial states and countries, relative to the same subject, and as to the causes of the accidents to employees." The act contained other provisions germane to the subject and provided for a full and final report to the legislature of 1910, if practicable, and if not practicable, then to the legislature of 1911, with such recommendations for legislation by bill or otherwise as the commission might deem wise or expedient. Such a commission was appointed and promptly organized by the election of officers and the appointment of sub-committees, the chairman being Senator Wainwright, from whom it has taken the name of the " Wainwright Commission," by which it is popularly known.   No word of praise could overstate the industry and intelligence of this commission in dealing with a subject of such manifold ramifications and of such far-reaching importance to the state, to employers and to employees.   We cannot dwell in detail upon the many excellent features of its comprehensive report, because the limitations of time and space must necessarily confine us to such of its aspects as have a necessary relation to the legal questions which we are called upon to decide.   As the result of its labors the commission recommended for adoption the bill which, with slight changes, was enacted into law by the legis-

lature of 1910, under the designation of article 14-a of the
Labor Law.   This act is modeled upon· the English Work-
men's Compensation Act of 1897, which has since been
extended so as to cover every kind of occupational injury.
Our commission has frankly stated in its report that the classi-
fication of the industries which will be immediately affected
by the present statute is only tentative, and that other more
extended classifications will probably be recommended to the
legislature for its action.

The statute, judged by our common-law standards, is plainly
revolutionary.   Its central and controlling feature is that every
employer who is engaged in any of the classified industries
shall be liable for any injury to a workman arising out of and
in the course of the employment by "a necessary risk or
danger of the employment or one inherent in the nature
thereof;   *   *   *   provided that the employer shall not be
liable in respect of any injury to the workman which is caused
in whole or in part by the serious and willful misconduct of
the workman."   This rule of liability, stated in another form,
is that the employer is responsible to the employee for every
accident in the course of the employment, whether the employer
is at fault or not, and whether the employee is at fault or not,
except when the fault of the employee is so grave as to con-
stitute serious and willful misconduct on his part.   The radi-
cal character of this legislation is at once revealed by con-
trasting it with the rule of the common law, under which the
employer is liable for injuries to his employee only when
the employer is guilty of some act or acts of negligence
which caused the occurrence out of which the injuries arise,
and then only when the employee is shown to be free from
any negligence which contributes to the occurrence.   The
several judicial and statutory modifications of this broad rule
of the common law we shall further on have occasion to men-
tion.   Just now our purpose is to present in sharp juxtaposi-
tion the fundamentals of these two opposing rules, namely,
that under the common law an employer is liable to his injured
employee only when the employer is at fault and the employee

is free from fault; while under the new statute the employer is liable, although not at fault, even when the employee is at fault, unless this latter fault amounts to serious and willful misconduct. [ The reasons for this departure from our long-established law and usage are summarized in the language of the commission as follows :

"*First,* that the present system in New York rests on a basis that is economically unwise and unfair, and that in operation it is wasteful, uncertain and productive of antagonism between workmen and employers.

"*Second,* that it is satisfactory to none and tolerable only to those employers and workmen who practically disregard their legal rights and obligations, and fairly share the burden of accidents in industries.

"*Third,* that the evils of the system are most marked in hazardous employments, where the trade risk is high and serious accidents frequent.

"*Fourth,* that, as matter of fact, workmen in the dangerous trades do not, and practically cannot, provide for themselves adequate accident insurance, and, therefore, the burden of serious accidents falls on the workmen least able to bear it, and brings many of them and their families to want."

This indictment of the old system is followed by a statement of the anticipated benefits under the new statute as follows : "These results can, we think, be best avoided by compelling the employer to share the accident burden in intrinsically dangerous trades, since by fixing the price of his product the shock of the accident may be borne by the community. ] In those employments which have not so great an element of danger, in which, speaking generally, there is no such imperative demand for the exercise of the police power of the state for the safeguarding of its workers from destitution and its consequences, we recommend, as the first step in this change of system, such amendment of the present law as will do away with some of its unfairness in theory and practice, and increase the workman's chance of recovery under the law.   With such changes in the law we couple an elect-

ive plan of compensation which, if generally adopted, will do away with many of the evils of the present system. Its adoption will, we believe, be profitable to both employer and employee, and prove to be the simplest way for the State to change its system of liability without disturbance of industrial conditions. Not the least of the motives moving us is the hope that by these means a source of antagonism between employer and employed, pregnant with danger for the State, may be eliminated."

This quoted summary of the report of the commission to the legislature, which clearly and fairly epitomizes what is more fully set forth in the body of the report, is based upon a most voluminous array of statistical tables, extracts from the works of philosophical writers and the industrial laws of many countries, all of which are designed to show that our own system of dealing with industrial accidents is economically, morally and leg lly unsound. Under our form of government, however, urts must regard all economic, philosophical and mora' cories, attractive and desirable though they may be, as s rdinate to the primary question whether they can be mo. I into statutes without infringing upon the letter or spirit of our written constitutions. In that respect we are unlike any of the countries whose industrial laws are referred to as models for our guidance. Practically all of these countries are so called constitutional monarchies in which, as in England, there is no written constitution, and the Parliament or law-making body is supreme. In our country the Federal and State Constitutions are the charters which demark the extent and the limitations of legislative power; and while it is true that the rigidity of a written constitution may at times prove to be a hindrance to the march of progress, yet more often its stability protects the people against the frequent and violent fluctuations of that which, for want of a better name, we call public opinion.

With these considerations in mind we turn to the purely legal phases of the controversy for the purpose of disposing of some things which are incidental to the main question.

The new statute, as we have observed, is totally at variance with the common-law theory of the employer's liability. Fault on his part is no longer an element of the employee's right of action. This change necessarily and logically carries with it the abrogation of the "fellow-servant" doctrine, the "contributory negligence" rule, and the law relating to the employee's assumption of risks. There can be no doubt that the first two of these are subjects clearly and fully within the scope of legislative power; and that as to the third, this power is limited to some extent by constitutional provisions.

The "fellow-servant" rule is one of judicial origin engrafted upon the common law for the protection of the master against the consequences of negligence in which he has no part. In its early application to simple industrial conditions it had the support of both reason and justice. By degrees it was extended until it became evident that under the enormous expansion and infinite complexity of our modern industrial conditions the rule gave opportunity, in many instances, for harsh and technical defenses. In recent years it has been much restricted in its application to large corporate and industrial enterprises, and still more recently it has been modified and, to some extent abolished, by the Labor Law and the Employers' Liability Act.

The law of contributory negligence has the support of reason in any system of jurisprudence in which the fault of one is the basis of liability for injury to another. Under such a system it is at least logical to hold that one who is himself to blame for his injuries should not be permitted to entail the consequences upon another who has not been negligent at all, or whose negligence would not have caused the injury if the one injured had been free from fault. It may be admitted that the reason of the rule is often lost sight of in the effort to apply it to a great variety of practical conditions, and that its efficacy as a rule of justice is much impaired by the lack of uniformity in its administration. In the admiralty branch of the Federal courts, for instance, we have what is known as the rule of comparative negligence

under which, when there is negligence on both sides, it is apportioned and a verdict rendered accordingly. In many of the states contributory negligence is a defense which must be pleaded and proved by the defendant, and in some states it has been entirely abrogated by statute. In our own state the plaintiff's freedom from contributory negligence is an essential part of his cause of action which must be affirmatively established by him, except in cases brought by employees under the Labor Law, by virtue of which the contributory negligence of an employee is now made a defense which must be pleaded and proved by the employer; and under the Employers' Liability Act which provides that the employee's continuance in his employment after he has knowledge of dangerous conditions from which injury may ensue, shall not, as matter of law, constitute contributory negligence.

Under the common law the employee was also held to have assumed the ordinary and obvious risks incident to the employment, as well as the special risks arising out of dangerous conditions which were known and appreciated by him. This doctrine, too, has been modified by statute so that under the Labor Law and the Employers' Liability Act the employee is presumed to have assented to the necessary risks of the occupation or employment and no others; and these necessary risks are defined as those only which are inherent in the nature of the business and exist after the employer has exercised due care in providing for the safety of his employees, and has complied with the laws affecting or regulating the business or occupation for the greater safety of employees.

We have said enough to show that the statutory modifications of the "fellow-servant" rule and the law of "contributory negligence" are clearly within the legislative power. These doctrines, for they are nothing more, may be regulated or even abolished. This is true to a limited extent as to the assumption of risk by the employee. In the Labor Law and the Employers' Liability Act, which define the risks assumed by the employee, there are many provisions which cast upon the employer a great variety of duties and burdens unknown

19

to the common law.   These can doubtless be still further mul-
tiplied and extended to the point where they deprive the
employer of rights guaranteed to him by our Constitutions,
·and there, of course, they must stop, as we shall endeavor to
demonstrate later on.

Passing now to the constitutional objections which are pre-
sented against the new statute, we will first eliminate those
which we regard as clearly or probably untenable.   The appel-
lant argues and the respondent admits that the new statute
cannot be upheld under the reserved power of the legislature
to alter and amend charters.   It is true that the defendant in
the case at bar is a railroad corporation, but the act applies to
eight enumerated occupations or industries without regard to
the character of the employers.   They may be corporations,
firms or individuals.   Nowhere in the act is there any refer-
ence to corporations.   The liability sought to be imposed is
based upon the nature of the employment and not upon the
legal status of the employer.   It is, therefore, unnecessary to
decide how far corporate liability may be extended under the
reserved power to alter or amend charters, except as that
question may be incidentally discussed in considering the
police power of the state.

The appellant contends that the classification in this stat-
ute, of a limited number of employments as dangerous, is
fanciful or arbitrary, and is therefore repugnant to that part
of the fourteenth amendment to the Federal Constitution which
guarantees to all our citizens the equal protection of the laws.
Classification for purposes of taxation or of regulation under
the police power, is a legislative function with which the
courts have no right to interfere unless it is so clearly arbi-
trary or unreasonable as to invade some constitutional right.
A state may classify persons and objects for the purpose of
legislation provided the classification is based on proper and
justifiable distinctions (*St. John* v. *New York*, 201 U. S. 633;
*Missouri Pac. Ry. Co.* v. *Mackey*, 127 U. S. 205; *Minne-
apolis & St. L. Ry. Co.* v. *Herrick*, 127 U. S. 210; *Chicago,
K. & W. R. R. Co.* v. *Pontius*, 157 U. S. 209), and for a

purpose within the legislative power. There can be no doubt, we think, that all of the occupations enumerated in the statute are more or less inherently dangerous to a degree which justifies such legislative regulation as is properly within the scope of the police power. We need not look for illustration or authority outside of the Labor Law to which this new statute has been added. The whole of that law which precedes the latest addition is devoted to restrictions and regulations imposed upon employers in specified occupations or conditions for the conservation of the health, safety and morals of employees. These restrictions and regulations do not affect all employers alike in all occupations, nor are they designed to have that effect. The mandate of the Federal Constitution is complied with if all who are in a particular class are treated alike (*Missouri Pac. Ry. Co.* v. *Humes,* 115 U. S. 512, 523; *Barbier* v. *Connolly,* 113 U. S. 27; *Soon Hing* v. *Crowley,* 113 U. S. 703; *Magoun* v. *Ill. Trust & Sav. Bank,* 170 U. S. 283, 294; *People ex rel. Hatch* v. *Reardon,* 184 N. Y. 431; *People ex rel. Farrington* v. *Mensching,* 187 N. Y. 8, 16), and that, we think, is the effect of this classification.

Another objection urged against the statute is that it violates section 2 of article 1 of our State Constitution which provides that "The trial by jury in all cases in which it has been heretofore used shall remain inviolate forever." This objection is aimed at the provisions of sections 219-a and 219-d of the statute, which relate to the "scale of compensation" and "settlement of disputes," and has no reference to the fundamental question whether the attempt to impose upon the employer a liability when he is not at fault, constitutes a taking of property without due process of law. In other words, the objection which we are now considering bears solely upon the question whether the two last-mentioned sections of the statute deprive the employer of the right to have a jury fix the amount which he shall pay when his liability to pay has been determined against him. If these provisions relating to compensation are to be construed as

definitely fixing the amount which an employer must pay in every case where his liability is established by the statute, there can be no doubt that they constitute a legislative usurpation of one of the functions of a common-law jury. In all cases where there is a right to trial by jury there are two elements which necessarily enter into a verdict for the plaintiff: 1. The right to recover. 2. The amount of the recovery. It is as much the right of a defendant to have a jury assess the damages claimed against him as it is to have the question of his liability determined by the same body. (*East Kingston* v. *Towle*, 48 N. H. 57; *Wadsworth* v. *Union Pacific Ry. Co.*, 18 Col. 600; *Fairchild* v. *Rich*, 68 Vt. 202.) This part of the statute, in its present form, has given rise to conflicting views among the members of the court, and, since the disposition of the question which it suggests is not necessary to the decision of the case, we do not decide it.

Thus far we have considered only such portions of the statute as we deem to be clearly within the legislative power, and one as to which there is difference of opinion. This we have done because we desire to present no purely technical or hypercritical obstacles to any plan for the beneficent reformation of a branch of our jurisprudence in which, it may be conceded, reform is a consummation devoutly to be wished. In this spirit we have called attention to those features of the new statute which might be upheld as consonant with legislative authority under our constitutional limitations, as well as to the sections upon which we are in doubt. We turn now to the two objections which we regard as fatal to its validity.

This legislation is challenged as void under the fourteenth amendment to the Federal Constitution and under section 6, article 1 of our State Constitution, which guarantee all persons against deprivation of life, liberty or property without due process of law. We shall not stop to dwell at length upon definitions of "life," "liberty," "property" and "due process of law." They are simple and comprehensive in themselves and have been so often judicially defined that there can be no

misunderstanding as to their meaning.   Process of law in its
broad sense means law in its regular course of administration
through courts of justice, and that is but another way of say-
ing that every man's right to life, liberty and property is to
be disposed of in accordance with those ancient and funda-
mental principles which were in existence when our Constitu-
tions were adopted.   " Due process of law implies the right
of the person affected thereby to be present before the
tribunal which pronounces judgment upon the question of
life, liberty or property in its most comprehensive sense;
to be heard by testimony or otherwise, and to have the
right of controverting by proof every material fact which
bears upon the question of right in the matter involved.
If any question of fact or liability be conclusively presumed
against him this is not due process of law." (*Zeigler* v.
*S. & N. Ala. R. R. Co.*, 58 Ala. 594.)   Liberty has been
authoritatively defined as " the right of one to use his facul-
ties in all lawful ways, to live and work where he will, to
earn his livelihood in any lawful calling, and to pursue
any lawful trade or avocation " (*Matter of Jacobs*, 98 N. Y.
98, 106); and the right of property as " the right to acquire,
possess and enjoy it in any way consistent with the equal
rights of others and the just exactions and demands of the
State." (*Bertholf* v. *O'Reilly*, 74 N. Y. 509, 515.)   The sev-
eral industries and occupations enumerated in the statute
before us are concededly lawful within any of the numerous
definitions which might be referred to, and have always been
so.   They are, therefore, under the constitutional protection.
One of the inalienable rights of every citizen is to hold and
enjoy his property until it is taken from him by due process
of law.   When our Constitutions were adopted it was the law
of the land that no man who was without fault or negligence
could be held liable in damages for injuries sustained by
another.   That is still the law, except as to the employers
enumerated in the new statute, and as to them it provides
that they shall be liable to their employees for personal
injury by accident to any workman arising out of and in the

course of the employment which is caused in whole or in part, or is contributed to, by a necessary risk or danger of the employment or one inherent in the nature thereof, except that there shall be no liability in any case where the injury is caused in whole or in part by the serious and willful misconduct of the injured workman. It is conceded that this is a liability unknown to the common law and we think it plainly constitutes a deprivation of liberty and property under the Federal and State Constitutions, unless its imposition can be justified under the police power which will be discussed under a separate head. In arriving at this conclusion we do not overlook the cogent economic and sociological arguments which are urged in support of the statute. There can be no doubt as to the theory of this law. It is based upon the proposition that the inherent risks of an employment should in justice be placed upon the shoulders of the employer, who can protect himself against loss by insurance and by such an addition to the price of his wares as to cast the burden ultimately upon the consumer; that indemnity to an injured employee should be as much a charge upon the business as the cost of replacing or repairing disabled or defective machinery, appliances or tools; that, under our present system, the loss falls immediately upon the employee who is almost invariably unable to bear it, and ultimately upon the community which is taxed for the support of the indigent; and that our present system is uncertain, unscientific and wasteful, and fosters a spirit of antagonism between employer and employee which it is to the interests of the state to remove. We have already admitted the strength of this appeal to a recognized and widely prevalent sentiment, but we think it is an appeal which must be made to the people and not to the courts. The right of property rests not upon philosophical or scientific speculations nor upon the commendable impulses of benevolence or charity, nor yet upon the dictates of natural justice. The right has its foundation in the fundamental law. That can be changed by the people, but not by legislatures. In a government like ours

theories of public good or necessity are often so plausible or sound as to command popular approval, but courts are not permitted to forget that the law is the only chart by which the ship of state is to be guided.  Law as used in this sense means the basic law and not the very act of legislation which deprives the citizen of his rights, privileges or property.  Any other view would lead to the absurdity that the Constitutions protect only those rights which the legislatures do not take away.   If such economic and sociologic arguments as are here advanced in support of this statute can be allowed to subvert the fundamental idea of property, then there is no private right entirely safe, because there is no limitation upon the absolute discretion of legislatures, and the guarantees of the Constitution are a mere waste of words. ) ( *Wynehamer* v. *People,* 13 N. Y. 378 ; *Taylor* v. *Porter,* 4 Hill, 140, 145 ; *Norman* v. *Heist,* 5 Watts. & Serg. 171 ; *Hoke* v. *Henderson,* 4 Dev. 15.)   As stated by Judge COMSTOCK in the case of *Wynehamer* v. *People,* " these constitutional safeguards, in all cases, require a judicial investigation, not to be governed by a law specially enacted to take away and destroy existing rights, but confined to the question whether, under the pre-existing rule of conduct, the right in controversy has been lawfully acquired and is lawfully possessed."   (p. 395.)  If the argument in support of this statute is sound we do not see why it cannot logically be carried much further.   Poverty and misfortune from every cause are detrimental to the state.   It would probably conduce to the welfare of all concerned if there could be a more equal distribution of wealth.   Many persons have much more property than they can use to advantage and many more find it impossible to get the means for a comfortable existence. If the legislature can say to an employer, " you must compensate your employee for an injury not caused by you or by your fault," why can it not go further and say to the man of wealth, " you have more property than you need and your neighbor is so poor that he can barely subsist ; in the interest of natural justice you must divide with your neighbor so that he and his dependents shall not become a charge upon the

State ? " The argument that the risk to an employee should
be borne by the employer because it is inherent in the
employment, may be economically sound, but it is at war with
the legal principle that no employer can be compelled to
assume a risk which is inseparable from the work of the
employee, and which may exist in spite of a degree of care by
the employer far greater than may be exacted by the most
drastic law. If it is competent to impose upon an employer,
who has omitted no legal duty and has committed no wrong,
a liability based solely upon a legislative fiat that his business
is inherently dangerous, it is equally competent to visit upon
him a special tax for the support of hospitals and other chari-
table institutions, upon the theory that they are devoted
largely to the alleviation of ills primarily due to his business.
In its final and simple analysis that is taking the property of
A and giving it to B, and that cannot be done under our Con-
stitutions. Practical and simple illustrations of the extent to
which this theory of liability might be carried could be mul-
tiplied *ad infinitum*, and many will readily occur to the
thoughtful reader. There is, of course, in this country no
direct legal authority upon the subject of the liability sought
to be imposed by this statute, for the theory is not merely new
in our system of jurisprudence, but plainly antagonistic to its
basic idea. The English authorities are of no assistance to
us, because in the king's courts the decrees of the Parliament
are the supreme law of the land, although they are interesting
in their disclosures of the paternalism which logically results
from a universal employers' liability based solely upon the
relation of employer and employee, and not upon fault in the
employer. There are a few American cases, however, which
clearly state the legal principle which, we think, is applicable
to the case at bar, and with a brief reference to them we shall
close this branch of the discussion. In the nitroglycerine
case (*Parrot* v. *Wells, Fargo & Co.,* 15 Wall. 524) the
plaintiff, who was the common landlord of the defendants
and other tenants, sought to hold the defendants liable for
damages occasioned to the premises occupied by the other

tenants, by an explosion of nitroglycerine which had been delivered to the defendants as common carriers for shipment. It appeared that the defendants were innocently ignorant of the contents of the packages containing the dangerous explosives, and that they were guilty of no negligence in receiving or handling them. Upon these facts the Federal Supreme Court held that it was a case of unavoidable accident for which no one was legally responsible. In *Ohio & Mississippi Ry. Co.* v. *Lackey* (78 Ill. 55) the question was whether the railroad company was liable under a statute which provided that " every railroad company running cars within this State shall be liable for all the expense of the coroner and his inquest, and the burial of all persons who may die on the cars, or who may be killed by collision, or other accident occurring. to such cars, or otherwise." In speaking of the effect of that section of the law Mr. Justice BREESE observed : "An examination of the section will show that no default, or negligence of any kind, need be established against the railroad company, but they are mulcted in heavy charges if, notwithstanding all their care and caution, a death should occur on one of their cars, no matter how caused, even if by the party's own hand. Running of trains by these corporations is lawful and of great public benefit. It is not claimed that the liability attaches for the violation of any law, the omission of any duty or the want of proper care or skill in running their trains. The penalty is not aimed at anything of this kind. We say penalty, for it is in the nature of a penalty, and there is a constitutional inhibition against imposing penalties where no law has been violated or duty neglected. Neither is pretended in this case, nor are they in the contemplation of the statute. A passenger on a train dies from sickness. He is a man of wealth. Why should his burial expenses be charged to the railroad company ? There is neither reason nor justice in it ; and if he be poor, having not the means for a decent burial, the general law makes ample provision for such cases." To the same effect are the numerous cases arising under statutes passed by different states imposing upon rail-

road corporations absolute liability for killing or injuring upon their rights of way horses, cattle, etc., by running over them, in which this liability was held to constitute a deprivation of property without due process of law. (*Jensen* v. *Union Pacific Ry. Co.*, 6 Utah, 253; *Ziegler* v. *South & North Alabama Ry. Co.*, 58 Ala. 594; *Birmingham Ry. Co.* v. *Parsons*, 100 Ala. 662; *Bielingbery* v. *Montana Union Ry. Co.*, 8 Mont. 271; *Schenk* v. *Union Pacific Ry. Co.*, 5 Wyo. 430.)

A different interpretation has been given to statutes imposing upon railroad corporations the duty to fence their rights of way, under which the liability is imposed for failure to obey the command of the statutes. (*Quackenbush* v. *Wis. & M. R. R. Co.*, 62 Wis. 411; *Missouri Pac. Ry. Co.* v. *Humes*, 115 U. S. 512; *Minneapolis & St. L. Ry. Co.* v. *Beckwith*, 129 U. S. 26.) " But even such statutes," says Black in his work on Constitutional Law (2d ed. p. 351), " cannot go beyond the imposition of such a penalty in cases where the fault lies at the door of the company. If the law attempts to make such companies liable for accidents which were not caused by their negligence or disobedience of the law, but by the negligence of others or by uncontrollable causes, or does not give the company an opportunity to show these facts in its own defense, it is void."

We conclude, therefore, that in its basic and vital features the right given to the employee by this statute, does not preserve to the employer the "due process" of law guaranteed by the Constitutions, for it authorizes the taking of the employer's property without his consent and without his fault. So far as the statute merely creates a new remedy in addition to those which existed before it is not invalid. The state has complete control over the remedies which it offers to suitors in its courts even to the point of making them applicable to rights or equities already in existence. It may change the common law and the statutes so as to create duties and liabilities which never existed before. It is true, as stated by Mr. Justice BROWN in *Holden* v. *Hardy* (169 U. S.

366, 385, 386), that " the law is, to a certain extent, a progressive science; that in some of the states methods of procedure, which at the time the Constitution was adopted were deemed essential to the protection and safety of the people, or to the liberty of the citizen, have been found to be no longer necessary; that restrictions which had formerly been laid upon the conduct of individuals, or of classes of individuals, had proved detrimental to their interests; while, upon the other hand, certain other classes of persons, particularly those engaged in dangerous or unhealthful employments, have been found to be in need of additional protection. Even before the adoption of the Constitution, much had been done toward mitigating the severity of the common law, particularly in the administration of its criminal branch. * * * The present century has originated legal reforms of no less importance. The whole fabric of special pleading, once thought to be necessary to the illumination of the real issue between the parties, has crumbled to pieces. The ancient tenures of real estate have been largely swept away, and land is now transferred almost as easily and cheaply as personal property. Married women have been emancipated from the control of their husbands and placed upon a practical equality with them with respect to the acquisition, possession and transmission of property. Imprisonment for debt has been abolished. Exemptions from execution have been largely added to, and in most of the states homesteads are rendered incapable of seizure and sale upon forced process. Witnesses are no longer incompetent by reason of interest, even though they be parties to the litigation. Indictments have been simplified, and an indictment for the most serious of crimes is now the simplest of all. In several of the states grand juries, formerly the only safeguard against a malicious prosecution, have been largely abolished, and in others the rule of unanimity, so far as applied to civil cases, has given way to verdicts rendered by a three-fourths majority." The power of the state to make such changes in methods of procedure and in substantive law is clearly recognized. (*Hurtado* v. *California*, 110

U. S. 516; *Hayes* v. *Missouri*, 120 U. S. 68 ; *Missouri Pac. Railway Co.* v. *Mackey*, 127 U. S. 205 ; *Hallinger* v. *Davis*, 146 U. S. 314; *Matter of Kemmler*, 136 U. S. 436 ; *Duncan* v. *Missouri*, 152 U. S. 377.) We repeat, however, that this power must be exercised within the constitutional limitations which prescribe the law of the land. " Due process of law " is process due according to the law of the land, and the phrase as used in the fourteenth amendment of the Federal Constitution with reference to the power of the states means the general law of the several states as fixed or guaranteed by their Constitutions. As stated by Mr. Webster, in the *Dartmouth College Case* (4 Wheat. 518), "the law of the land is the general law; the law which hears before it condemns, which proceeds upon inquiry and renders judgment only after trial."

If we are warranted in concluding that the new statute violates private right by taking the property of one and giving it to another without due process of law, that is really the end of this case. But the auspices under which this legislation was enacted, no less than its intrinsic importance, entitle its advocates to the fullest consideration of every argument in its support, and we, therefore, take up the discussion of the police power under which this law is sought to be justified. The police power is, of course, one of the necessary attributes of civilized government. In its most comprehensive sense it embraces the whole system by which the state seeks  to preserve the public order, to prevent offenses against the law, to insure to citizens in their intercourse with each other the enjoyment of their own so far as is reasonably consistent with a like enjoyment of rights by others. Under it persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health and prosperity of the state. But it is a power which is always subject to the Constitution, for in a constitutional government limitation is the abiding principle, exhibited in its highest form in the Constitution as the deliberative judgment of the people, which moderates every claim of right and controls every use of power. In the language of Chief Justice Shaw,

in *Commonwealth* v. *Alger* (7 Cush. 85) ; " It is much easier
to perceive and realize the existence and sources of this power
than to mark its boundaries or prescribe limits to its exercise."
It covers a multitude of things that are designed to protect
life, limb; health, comfort, peace and property according to
the maxim *sic utere tuo ut alienum non lædas*, but its exer-
cise is justified only when it appears that the interests of the
public generally, as distinguished from those of a particular
class, require it, and when the means used are reasonably
necessary for the accomplishment of the desired end, and are
not unduly oppressive. (*Lawton* v. *Steele*, 152 U. S. 133, 137 ;
*Colon* v. *Lisk*; 153 N. Y. 188, 196 ; *Wright* v. *Hart*, 182 N. Y.
330.) In order to sustain legislation under the police power
the courts must be able to see that its operation tends in some
degree to prevent some offense or evil, or to preserve public
health, morals, safety and welfare. If it discloses no such
purpose, but is clearly calculated to invade the liberty and
property of private citizens, it is plainly the duty of the
courts to declare it invalid, for legislative assumption of the
right to direct the channel into which the private energies of
the citizen may flow, or legislative attempt to abridge or
hamper the right of the citizen to pursue, unmolested and
without unreasonable regulation, any lawful calling or avo-
cation which he may choose, has always been condemned
under our form of government. Concrete illustrations of
what may and what may not be done under the police power
are to be found in this very Labor Law of which the new
statute is a part.    As this statute stood before article 14-a was
added, it regulated electric work, the operation of elevators,
work on scaffolds, work with explosives and compressed air,
the construction of tunnels and railroad work.    It regulated
the hours of work in certain employments ; it directed the
payment of wages in cash at specified periods ; it provided
for the protection of employees engaged in the erection of
buildings ; it compelled the employer to guard dangerous and
exposed machinery and to construct fire escapes and ventilating
appliances ; it required him to provide toilet facilities, pure

drinking water and sanitary arrangements and prohibited the
employment of women, and of children under certain ages, in
specified occupations; it regulated the hours of labor of minors;
it modified the fellow-servant rule, the law of contributory
negligence and the assumption of risks; and, in short, it
imposed upon the employer many restrictions and duties
which were unknown to the common law. Broadly classi-
fied, all these and similar statutory provisions which are
designed, in one way or another, to conserve the health,
safety or morals of the employees and to increase the
duties and responsibilities of the employer, are rules of con-
duct which properly fall within the sphere of the police
power. (*Holden* v. *Hardy*, 169 U. S. 366; *Missouri Pac. Ry.
Co.* v. *Mackey*, 127 U. S. 205.) But the new addition to
the Labor Law is of quite a different character. It does
nothing to conserve the health, safety or morals of the
employees, and it imposes upon the employer no new or
affirmative duties or responsibilities in the conduct of his
business. Its sole purpose is to make him liable for injuries
which may be sustained wholly without his fault, and solely
through the fault of the employee, except where the latter
fault is such as to constitute serious and willful misconduct.
Under this law, the most thoughtful and careful employer,
who has neglected no duty, and whose workshop is equipped
with every possible appliance that may make for the safety,
health and morals of his employees, is liable in damages to
any employee who happens to sustain injury through an acci-
dent which no human being can foresee or prevent, or which,
if preventable at all, can only be prevented by the reasonable
care of the employee himself. That this is the unmistakable
theory and purpose of the act is made perfectly plain by the
recital in section 215, which sets forth that from the nature,
conditions or means of prosecution of the work in the employ-
ments which are classified as dangerous, "extraordinary risks
to the life and limb of workmen engaged therein are inherent,
necessary or substantially unavoidable, and as to each of which
employments it is deemed necessary to establish a new system

of compensation for accidents to workmen." And to make the matter still more plain, the learned counsel for the commission argues in his brief that "if it is competent for the legislature to say to the employer in a dangerous trade, 'use the utmost care in giving your workmen safe work, so that no act of yours, or implement of yours, or work that you set them to do shall hurt them, and if you fail you shall be liable in damages,' if it is competent to make such a law, then it is equally competent to say as in this new act directly, 'you shall be responsible for all damages caused by unsafe condition of work,' and that is just what the liability for trade risks under the new act means." In this argument the learned counsel ignores, or at least misses, as we think, the vital distinction between legislation which imposes upon an employer a legal duty, for the failure to perform which he may be penalized or rendered liable in damages, and legislation which makes him liable notwithstanding he has faithfully observed every duty imposed upon him by law. At pages 46 and 47 of the report of the commissioners are quoted the several pertinent provisions of our State Constitution. (Art. 1, sec. 18; art. 1, sec. 2; art. 1, sec. 1; art. 1, sec. 6.) With reference to these, the commissioners say : "It is obvious, on a mere reading, that the first section makes it impossible for the legislature to enact any law which will take away from the representatives of an injured workman the right of action there named for injuries causing death, nor can the legislature limit it in any way. It is equally obvious, it seems to us, that it was the intention of the second section of the Constitution (Art. 1, sec. 2), to provide that in all controversies in the courts of law either side should finally have a right to a jury trial on the question of liability, and however successful or unsuccessful jury trials may be in cases of employer's liability, or in other cases, that solemn mandate of the Constitution cannot be set aside. The third and fourth sections of the Constitution above quoted are practically those which, like the fourteenth amendment of the Federal Constitution, provide for due process of law in all legislation, that is, speak-

ing generally, which prohibit the passage by the legislature of such legislation as shall arbitrarily deprive any of the citizens of the state of life, liberty or property."

These are interesting and salient admissions, but the ease with which these constitutional provisions are brushed aside is startling. Continuing, the commissioners say : " But we regard it as settled that the legislature has power, if it so chooses, to change or abrogate the common law on employer's liability, or the Employers' Liabilty Act, or any other statutes in regard thereto. * * * The legislature of this state, in the exercise of its general powers, * * * has in the past so legislated as to prescribe that employers in New York industries, shall conduct their business, use their machines and use their property in such ways as shall conduce to the safety of the employees and the prevention of accident and disease. Such is the whole purpose of the Labor Law. * * * We are of opinion that it is competent for the legislature to take a further step and provide conditions of the carrying on of such dangerous industries — not at the moment conditions as to the method of carrying them on — but conditions providing that any man in the state who carries on such dangerous trades shall be liable to make compensation to the employees injured either by the fault of the employer, or by those unavoidable risks of the employment. The effect of such a statute would be to reverse the common-law doctrine that the employee assumes the risk of his employment."

With all due respect to the members of the commission we beg to observe that the statute enacted in conformity with their recommendations, does not stop at reversing the common law; it attempts to reverse the very provisions of the Constitution which, the commissioners admit, are obviously beyond the reach of the legislature. We cannot understand by what power the legislature can take away from the employer a constitutional guaranty of which the employee may not also be deprived. If it is beyond the power of the legislature to take from the representatives of deceased

employees their rights of action under the Constitution, by what measure of power or justice may the legislature assume to take from the employer the right to have his liability determined in an action at law? Conceding, as we do, that it is within the range of proper legislative action to give a workman two remedies for a wrong when he had but one before, we ask, by what stretch of the police power is the legislature authorized to give a remedy for no wrong? If, before the passage of this law, the employer had a right to a jury trial upon the question of liability, where and how did he lose it? Can it be taken from him by the mere assertion that this statute only reverses the common-law doctrine that the employee assumes the risk of his employment? It would be quite as logical and effective to argue that this legislation only reverses the laws of nature, for in everything within the sphere of human activity the risks which are inherent and unavoidable must fall upon those who are exposed to them. We must admit that what the legislature may prohibit it may absolutely control. Where the right to exist, as in case of corporations, depends upon the will of the legislature, that right may be granted subject to prescribed conditions. In such a case an employer may be made an insurer of the safety of his employees as a condition of the permission to engage in business. But when an industry or calling is *per se* lawful and open to all, and, therefore, beyond the prohibitive power of the legislature, the right of governmental control must be confined to such reasonable enactments as are directly designed to conserve health, safety, comfort, morals, peace and order. (*Lochner* v. *New York*, 198 U. S. 45.) For the failure of an employer to observe such regulations the legislature may unquestionably enact direct penalties or create presumptions of fault which, if not rebutted by proof, may be regarded as sufficient evidence of liability for damages. That must be the extreme limit of the police power, for just beyond is the Constitution which, in substance and effect, forbids that a citizen shall be penalized or subjected to liability unless he has violated some law or has been guilty of some fault.

20

The limitations of the police power are illustrated in a great variety of cases. In *Matter of Jacobs* (98 N. Y. 98, 99) it was held that an act was void which made it a misdemeanor to manufacture cigars or prepare tobacco in certain tenements. In *People* v. *Marx* (99 N. Y. 377) this court condemned an act absolutely prohibiting the manufacture or sale of oleomargarine, upon the ground that it interfered with a lawful industry, not injurious to the public and not fraudulently conducted, although in a later case (*People* v. *Arensberg*, 105 N. Y. 123) another statute relating to the same subject was upheld because it was directly aimed at a designed and intentional imitation of dairy butter. In *People* v. *Gillson* (109 N. Y. 389, 404) it was held that a statute was not within the police power which prohibited the sale or disposal of any article of food upon any representation or inducement that anything else will be delivered as a gift, prize, premium or reward to the purchaser. The ground of the decision was that it was not a health law; that it was not designed to prevent the adulteration of food, and that it was not in the power of the legislature to convert an innocent act into a crime. In *Colon* v. *Lisk* (153 N. Y. 188) the statute under consideration provided for the summary seizure of any boat or vessel, used by one person in interfering with the oysters or shell fish of another, and for its forfeiture and sale. It was held that the statute sanctioned an unauthorized confiscation of private property for the mere protection of private rights and was not within the police power of the state. In *People* v. *Hawkins* (157 N. Y. 1) this court decided that a statute was void which made it a misdemeanor to sell or expose for sale any goods made in a penal institution unless they were labeled "convict made." In *People* v. *Orange County Road Con. Co.*, (175 N. Y. 84) it was held that the state cannot dictate to independent contractors on state work the hours of labor which they shall prescribe for their employees, where there was nothing in the character of the work or in the provisions of the contract to justify legislative interference. In *Beardsley* v. *N. Y., L. E. & W. R. R. Co.* (162 N. Y. 230) what is

known as the "Mileage Book Act," which required railroad companies to issue mileage books and provided a penalty for refusal, was unconstitutional as to railroad corporations in existence at the time of its enactment, because it was an illegal invasion of the vested property rights of such corporations. In *Schnaier* v. *Navarre Hotel & I. Co.* (182 N. Y. 88) the court pronounced invalid a statute which provided that it should be unlawful for a copartnership to engage in the business of "employing" or master plumber unless each and every member thereof shall have registered, after examination and certification by an examining board of plumbers. In *People* v. *Marcus* (185 N. Y. 257) it was held that a section of the Penal Code was void which provided, in substance, that no person shall make the employment of another, or the continuance of such employment, conditional upon the employee's not joining or becoming a member of a labor organization. In *People* v. *Williams* (189 N. Y. 131, 134) this court condemned that part of the Labor Law which prohibited the employment of an adult female in a factory before six o'clock in the morning or after nine o'clock in the evening, and held that it was not a proper exercise of the police power, since it had no reference to the number of hours of labor or to the healthfulness of the employment.

We have yet to consider certain special cases upon which the exponents of this new law have planted their faith and hope, and these run along such divergent lines as to indicate, more clearly than anything else, the absence of any sound legal theory upon which this legislation can be sustained. These cases are cited in support of the contention that the common law and our statutes furnish many illustrations of legal liability without fault, but we shall endeavor by analysis to show how inapplicable they are to the questions now before the court. The case of *Marvin* v. *Trout* (199 U. S. 212) arose under an Ohio statute which subjected premises used for gambling to a lien for money lost in gambling. The statute forbade gambling, and the court very properly argued that "The power of the state to enact laws to suppress

gambling cannot be doubted, and, as a means to that end, we have no doubt of its power to provide that the owner of the building in which gambling is conducted, who knowingly looks on and permits such gambling, can be made liable in his property which is thus used, to pay a judgment against those who won the money, as is provided in the statute. * * * The liability of the owner of the building to make good the loss sustained, under the circumstances set forth in the statute, was clearly part of the means resorted to by the legislature for the purpose of suppressing the evil in the interests of the public morals and welfare." (p. 224.) A more cogent illustration of the undoubted application of the police power cannot be found. In the interest of good morals it is not merely the right but the duty of the state to suppress gambling, and the case, so far from being an authority for the idea of liability without fault, proceeds directly upon the theory that the owner was at fault in permitting his premises to be used for an illegal purpose. Then there is. the case of *Bertholf* v. *O'Reilly* (74 N. Y. 509), in which this court upheld the so-called "Civil Damage act" which gave to every husband, wife, parent, guardian, employer or other person who should be injured in person or property or means of support by any intoxication of any person, a right of action against any person who by selling or giving away intoxicating liquors caused the intoxication, in whole or in part, and subjecting to the same liability any person or persons owning or renting or permitting the occupation of any building or premises with knowledge that intoxicating liquors were to be sold thereon. In that case, as in the case of *Marvin* v. *Trout* (*supra*), the controlling principle was that the state had the right to prohibit and, therefore, the absolute right to control. As Judge ANDREWS pertinently observed, "the right of the state to regulate the traffic in intoxicating liquors, within its limits, has been exercised from the foundation of the government, and is not open to question. The state may prescribe the persons by whom and the conditions under which the traffic may be carried on. It may impose

upon those who act under its license such liabilities and pen-
alties as in its judgment are proper to secure society against
the dangers of the traffic and individuals against injuries
committed by intoxicated persons under the influence of or
resulting from their intoxication." (p. 517) The defendant in
that case, it is true, was not the licensee, but he had rented
his premises for the traffic in intoxicating liquors knowing
that they were to be so used. Upon that feature of the case
Judge ANDREWS said : "The liability imposed upon the land-
lord for the acts of the tenant is not a new principle in legis-
lation. His liability only arises when he has consented that
the premises may be used as a place for the sale of liquors.
He selects the tenant, and he may, without violating any con-
stitutional provision, be made responsible for the tenant's acts
connected, with the use of the leased property." (p. 525) That
is very far from being a case of liability without fault. The
enactment of the "Civil Damage Act" was clearly within the
police power, and the liability imposed did not deprive either
the tenant or the landlord of "due process of law," for each
had the right to his day in court and an opportunity to dis-
prove the facts upon which the statutory right of action
depended. Let us suppose, however, that the statute had
gone so far as to provide that the mere fact of selling liquor
by the tenant, or the mere fact of renting the premises for
that purpose by the landlord, should be deemed conclusive
proof of the intoxication of the person to whom the liquor
was sold, and of the fact that the person bringing the suit had
suffered injury thereby, so that the person sued could not be
heard to deny or disprove his responsibility for the intoxi-
cation or the injuries resulting therefrom. Would that be
"due process of law?" Suppose that the Ohio statute, which
was also clearly within the general scope of the police power,
had imposed upon the landlord a liability for money lost in
gambling on his premises without his knowledge of the pur-
pose for which the building was used, and had declared that
evidence of the mere loss of the money should be sufficient to
sustain a judgment against him. That would clearly be a

case of liability without fault; but what court, controlled by constitutional limitations, would render such a judgment? We are referred to the case of *Chicago, Rock Island & Pacific Railway Co.* v. *Zernecke* (183 U. S. 582) as an illustration of liability without fault. We think that case has no analogy to the case at bar. There a statute of Nebraska imposed upon railroad corporations a liability for all injuries to passengers except when occasioned by the criminal negligence of the person injured, or when the injury was sustained in the violation of some express rule or regulation of the corporation. The point decided in that case was that this rule of liability was a part of the very statute under which the corporation took its charter. The defendant in the case at bar is a railroad corporation, and as such may be subject to state regulations which would not apply to other corporations or to individuals, but we are not now concerned with that question, since the statute before us has reference to employers in their relations with their employees, and not to railroads in their service to the public.

In support of this new statute we are also asked to consider the supposed analogies of the law of deodands; the common-law liability of the husband for the torts of his wife; the liability of the master for the acts of his servant, and the liability of a ship for the care and maintenance of sick or disabled seamen. From the historical point of view, these subjects might be very entertainingly elaborated, but for the practical purposes of this discussion they may be very briefly disposed of. If the law of deodands was ever imported into this country it has never, to our knowledge, found expression in a single statute or judicial decision. It was one of those primitive conceptions of justice under which a chattel which caused the death of a human being was forfeited to the king. We are unable to see what bearing it can have upon the question whether, under our Constitutions, it is due process of law to render a man liable for damages when he has been guilty of no fault. Quite as far-fetched seems the argument based upon the common law liability of the husband for the torts of his wife.

Under the common-law unity of husband and wife, the latter was presumed to act under the compulsion of the former; and the wife could never be sued alone.   As the marriage vested the husband with the personal property of the wife, it was simply logical that he should pay her obligations.   So with the liability of the master for the acts of his servant, the whole theory is expressed in the maxim *qui facit per alium facit per se.*   He who acts through another acts himself.  ' How do these illustrations support the principle of liability without fault?   Could a husband or master be held liable under the common law when the wife or servant had been guilty of no wrong?   Would the common law have denied to the husband or master the right to prove that no tort had been committed by the wife or servant?   The admiralty cases of *The Osceola* (189 U. S. 158), *The City of Alexandria* (17 Fed. Rep. 399), and the case of *Scarff* v. *Metcalf* (107 N. Y. 211) seem to us equally inapplicable as authorities for the proposition that the law recognizes liability without fault.   It is common knowledge that the contracts and services of seamen are exceptional in character.   A seaman engages for the voyage. He is subject to physical discipline, and exposed to hardships and dangers peculiar to the sea.   He is, in effect, a co-adventurer with the master, and shares in the risks of shipwreck and capture, often losing his wages by casualties which do not affect workmen on land.   For these and many other obvious reasons the maritime law has wisely and benevolently built up peculiar rights and privileges for the protection of the seaman which are not cognizable in the common law. When he is sick or injured he is entitled to be cared for at the expense of the ship, and for the failure of the master to perform his duty in this regard, the ship or the owner is liable. That is a right given to the seaman, and a duty enjoined upon the master, by the plainest dictates of justice, which arises out of the necessities of the case; and, because of the reason of the rule, the right and duty cease when the contract has terminated and the seaman has been returned to the port of shipment or discharge, or has been furnished with

means to do so.  But beyond this duty on the part of the master or owner, there seems to be no liability whatever for injuries sustained by the seaman in the course of his work. We think it may confidently be asserted that within the whole range of the maritime law there will be found no rule which renders master, owner or ship liable in damages for an injury sustained by the seaman without fault on the part of any one, or without any fault except his own.  The case of *Scarff* v. v. *Metcalf* (107 N. Y. 211) was not disposed of upon any such theory, but was based upon the neglect of the master to perform the duty of caring for the injured seaman imposed by the maritime law.  The legal status of seamen is clearly illustrated in the case of *Robertson* v. *Baldwin* (165 U. S. 275), where it was held that compulsory personal service of a seaman in performance of his contract was not a violation of the thirteenth amendment to the Federal Constitution forbidding slavery or involuntary servitude.  In that case the learned justice who wrote for the court suggested that enforced service under a seaman's contract was not involuntary within the Constitution, although the contract would not be enforced by the courts.  But in the later case of *Clyatt* v. *United States* (197 U. S. 207) it was held that peonage or enforced service, whether under a voluntary contract of service or not, was involuntary servitude and forbidden by the Constitution in all cases save those arising out of the exceptional relations of the seaman to his ship, the child to its parents and the apprentice to his master.  In the review in *Robertson* v. *Baldwin* (*supra*), of the various decisions in admiralty, it is made quite clear that the courts have always regarded seamen as irresponsible to a degree which makes them incapable of fully protecting their own rights.  With the power given to the employer of seamen to compel specific performance of their contracts, there are imposed certain obligations unknown to any other relation.  It is a relation which rests on affirmative law and not on natural right.  We can find no analogy between a case arising out of such a relation and one in which an adult of sound mind and capable of freely contracting for

himself voluntarily enters upon employment from which he is at liberty to withdraw whenever he will.

Great reliance is placed upon the case of *St. Louis & San Francisco Ry. Co.* v. *Mathews* (165 U. S. 1) in support of the contention that there may be liability where there is no delinquency. That was an action brought by an owner of land adjoining the defendant's railroad to recover damages for the destruction of his dwelling house and other buildings, caused by fire which spread from sparks emitted by the defendant's locomotives. The action was brought under a statute of the state of Missouri which provided that "each railroad corporation, owning or operating a railroad in this state, shall be responsible in damages to every person and corporation whose property may be injured or destroyed by fire communicated, directly or indirectly, by locomotive engines in use upon the railroad owned or operated by such railroad corporation; and each such railroad corporation shall have an insurable interest in the property upon the route of the railroad owned or operated by it, and may procure insurance thereon in its own behalf, for its protection against such damages." The statute was upheld as being within the legislative power of the state. That decision is amply supported by a number of reasons which have no application to the controversy at bar. To begin with, the Constitution of Missouri contained a clause, which was in force when the railroad company obtained its charter, providing that "the exercise of the police power of the state shall never be abridged, or so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals, or the general well-being of the state." (Missouri Const. art. 12, sec. 5.) Another ample reason is found in the fact that railroads alone "have the privilege of taking a narrow strip of land from each owner, without his consent, along the route selected for the track, and of traversing the same at all hours of the day and night, and at all seasons whether wet or dry, with locomotive engines that scatter fire along the margin of the land not taken, thereby subjecting all com-

bustible property to extraordinary hazard of loss." (*Grissell v. Housatonic R. R. Co.*, 54 Conn. 447.) Then, again, "the right to use the agencies of fire and steam in the movement of railway trains is * *. * derived from the legislation of the state, and it certainly cannot be denied that it is for the state to determine what safeguards must be used to prevent the escape of fire, and to define the extent of the liability for fires resulting from the operation of trains by means of steam locomotives. This is a matter within state control." (*Hartford F. Ins. Co.* v. *Chi., Mil. & St. Paul Ry. Co.*, 62 Fed. Rep. 904.) A legislature may, if it chooses, make it a condition of the right to run carriages propelled by the agency of fire, that the corporation employing them shall be responsible for all injuries which fire may cause. (*Ingersoll* v. *Stockbridge & Pittsfield R. R. Co.*, 8 Allen, 438.; *Grand Trunk Ry. Co.* v. *Richardson*, 9 U. S. 454.) And, finally, these statutes are designed to protect the rights of those who have no contractual relations to the corporations which inflict the injury. In such a case, when both parties are equally faultless, the legislature may properly consider it to be just that the duty of insuring private property against loss or injury caused by the use of the dangerous instruments should rest upon the railroad company, which employs the instruments and creates the peril for its own profit, rather than upon the owner of the property who has no control over or interest in these instruments. Quite aside from the considerations which support such a statutory liability against railroad corporations, it may be added that it is in no sense an extension of the rule of the common law to modern conditions, but in reality a return to the original common-law doctrine under which every person who permitted fire started by him to escape beyond his house or close was liable to every one who suffered loss or injury thereby. The severity of that early English rule was moderated by numerous statutes, among which are 6 Anne and 14 Geo. III. As to these two last-mentioned statutes it has been held that they became by adoption a part of the common law of this state (Thompson's Negligence, vol. 1, p. 148 *et seq.*,

notes under " Liability for Damages by Fire," and *Webb* v. *R., W. & O. R. R. Co.,* 49 N. Y. 420, 426), under which neither individuals nor corporations are liable for escaping fire unless there is negligence. (*Clark* v. *Foot,* 8 Johns. 421; *Bennett* v. *Scutt,* 18 Barb. 347, 349; *Stuart* v. *Hawley,* 22 Barb. 619, 621; *Radcliff's Exrs.* v. *Mayor, etc., of Brooklyn,* 4 N. Y. 195, 200; *Calkins* v. *Barger,* 44 Barb. 424; *Sheldon* v. *Hudson R. R. R. Co.,* 14 N. Y. 219; *Steinweg* v. *Erie Ry.* 43 N. Y. 123, 127.) The cited cases arising out of injuries inflicted by animals of known dangerous or vicious propensities, and the liability which has often been imposed for the maintenance of private nuisances, we shall not discuss, for we think they are governed by well- settled principles which clearly have no application to the questions now before us.

In the addenda to the instructive brief of the counsel for the commission our attention is called to three decisions of the Federal Supreme Court which have been but. recently decided and are not yet officially reported. (*Noble State Bank* v. *Haskell,* 219 U. S. 104; *Assaria State Bank* v. *Dolley,* 219 U. S. 121, and *Engel* v. *O'Malley,* 219 U. S. 128.) These cases, it is contended, strongly support the validity of the legislation which we are condemning because, as counsel asserts, they go directly to the ultimate question: " Is the act an unreasonable regulation of the *status* of employment?" We have tried to make it clear that in our judgment this statute is not a law of regulation. It contains not a single provision which can be said to make for the safety, health or morals of the employees therein specified, nor to impose upon the enumerated employers any duty or obligation designed to have that effect. It does not affect the *status* of employment at all, but writes into the contract between the employer and employee, without the consent of the former, a liability on his part which never existed before and to which he is permitted to interpose practically no defense, for he can only escape liability when the employee is injured through his own willful misconduct. That is a defense which needs no legislative sanction, since it would be abhorrent to the

most primitive notions of justice to permit one to impose
liability for his willfully self-inflicted injuries upon another
who is wholly free from responsibility for them.    The
case of *Engel* v. *O'Malley* (*supra*) is so clearly distin-
guishable from the case at bar that we need only state the facts
to mark the contrast.    The *Engel* case arose under a New
York statute which provides that individuals and firms shall
not engage in the business of receiving deposits for safe
keeping or for transmission, or for any other purpose, or
in the business of banking, without first obtaining from the
state comptroller a license.    The same statute further provides
that applicants for such a license must pay a prescribed fee, give
bonds and submit to other restrictions.    We have already
passed upon the constitutionality of certain parts of that
statute, (L. 1907, ch. 185) in *Musco* v. *United Surety Co.*
(196 N. Y. 459), which was an action upon a bond given
under it, and have held that " the regulation of the business
of receiving deposits is plainly within the power possessed by
the state to regulate the conduct of various pursuits when neces-
sary for the protection of the public." (p. 465)    The portion
of the statute under consideration in the last cited case was
plainly directed against an obvious evil which vitally affected
the public welfare.    The city of New York is the gateway
through which this country admits each year thousands of poor
and ignorant immigrants who deal with individuals and firms
engaged in the business of exchanging domestic for foreign
money, receiving deposits and transmitting remittances to
foreign ports.    It is a business which may, and probably does,
attract some irresponsible and mercenary adventurers.    A law
designed to regulate and safeguard such a business in a way
which affects no constitutional property rights, is plainly
within the police power of the state.    That is all that was
involved in the *Musco* case, and that is the extent to which
this court has passed upon the constitutionality of the New
York statute (L. 1907, ch. 185).    It need hardly be argued
that a law passed under the guise of such a purpose, but hav-
ing in fact no relation to it, and accomplishing nothing to

make the business of receiving deposits more safe, would be as far beyond the sphere of the police power as an amendment to the Banking Law requiring banks and bankers to protect their customers, to whom they pay moneys, against thefts or other physical losses thereof; or an amendment to the Labor Law which would compel the industrial employers to give each employee a vacation on full pay during two months of every year.

As to the cases of *Noble State Bank* v. *Haskell* (219 U. S. 104) and *Assaria State Bank* v. *Dolley* (219 U. S. 121) we have only to say that if they go so far as to hold that any law, whatever its effect, may be upheld because by the " prevailing morality " or the " strong and preponderant opinion " it is deemed " to be greatly and immediately necessary to the public welfare," we cannot recognize them as controlling of our construction of our own Constitution. That the business of banking in the several states may be regulated by legislative enactment is too obvious for discussion. That the extent to which such state regulation may be carried must depend upon the difference in constitutional provisions is also plain. How far these late decisions of the Federal Supreme Court are to be regarded as committing that tribunal to the doctrine that any citizen may be deprived of his private property for the public welfare we are not prepared to decide. All that it is necessary to affirm in the case before us is that in our view of the Constitution of our state, the liability sought to be imposed upon the employers enumerated in the statute before us is a taking of property without due process of law, and the statute is therefore void.

The judgment of the Appellate Division should be reversed and judgment directed for the defendant, with costs in all courts.

Cullen, Ch. J.   I concur in the opinion of Judge Werner for reversal of the judgment appealed from. I concede that the legislature may abolish the rule of fellow-servant as a defense to an action by employee against the employer.

Indeed, we have decided that in upholding the so-called
Barnès Act. (*Schradin* v. *N. Y. C. & H. R. R. R. Co.*,
194 N. Y. 534.) I concede that the legislature may also
abolish as a defense the rule of assumption of risk and that of
contributory negligence unless the accident proceeds from the
willful act of the employee. I concede that in a work, occu-
pation or business of such a nature that the legislature 'might
prohibit its pursuit or exercise altogether, the legislature
may prescribe terms under which it may be carried on.
Plainly, this litigation does not present such a case. The
legislature could not revoke the franchise it had previously
given to the defendant to operate a railroad. (*People* v.
*O'Brien*, 111 N. Y. 1.) I am not prepared to deny that
where the effects of the work, even though prosecuted
carefully, go beyond a person's own property and . injure
third persons in no way connected therewith, the person
for whose account the work is done may be held liable
for injuries occasioned thereby. I also concede the most
plenary power in the legislature to prescribe all reasonable
rules for the conduct of the work which may conduce to the
safety and health of persons employed therein. But I do
deny that a person employed in a lawful vocation, the effects
of which are confined to his own premises, can be made
indemnify another for injury received in the work unless he
has been in some respect at fault. I am not impressed with
the argument that " the common law imposed upon the
employee entire responsibility for injuries arising out of
the necessary risks or dangers of the employment. The
statute before us merely shifts such liability upon the
employer." It is the physical law of nature, not of govern-
ment, that imposes upon one meeting with an injury, the suf-
fering occasioned thereby. Human law cannot change that.
All it can do is to require pecuniary indemnity to the party
injured, and I know of no principle on which one can be
compelled to indemnify another for loss unless it is based upon
contractual obligation or fault. It might as well be argued
in support of a law requiring a man to pay his neighbor's

debts, that the common law requires each man to pay
his own debts, and the statute in question was a mere modi-
fication of the common law so as to require each to pay
his neighbor's debts. It is urged that the legislation before
us can be upheld on the decision of the Supreme Court of
the United States in *Noble State Bank* v. *Haskell* (219 U. S.
104). In support of the claim there is cited from the opinion
the following: " It may be said in a general way that the
police power extends to all the great public needs. (*Camfield*
v. *United States,* 167 U. S. 518.) It may be put forth in aid
of what is sanctioned by usage, or held by the prevailing
morality or strong and preponderant opinion to be greatly and
immediately necessary to the public welfare." (P. 111.) It is
possible that the doctrine of these two sentences would justify
the statute before us and possibly any legislation, if only sup-
ported by a sufficient popular demand, but it is both unfair
and unsafe to excerpt fragmentary sentences from the opin-
ion of a court and interpret them apart from the context of
the whole opinion. However that may be, the decision in
the *Noble Bank* case is not controlling upon this court in the
construction of the Constitution of our own state, and I am
not disposed to accept it, at least, until it has received the
approval of a majority of the court. I concur with Judge
Werner that the act, as applicable to the case before us, can-
not be considered as an exercise of the power of the state to
regulate corporations. The act is general, not confined to
corporations, and even if it were, I think its effect would be
a deprivation of property not authorized by the reserved
power to regulate.

As to corporations hereafter formed, the question is very
different. The franchise to be a corporation is not one
inherent in the citizen, but proceeds solely from the bounty
of the legislature, and for that reason the legislature may
dictate the terms on which it will be granted and require
the acceptance of the provisions of this act as a condition
of incorporation. (*Purdy* v. *Erie R. R. Co.,* 162 N. Y.
42; *Minor* v. *Erie R. R. Co.,* 171 N. Y. 566; *People*

ex rel. Schurz v. Cook, 110 N. Y. 443; S. C., 148 U. S. 397; Chicago, R. I. & Pac. R. Co. v. Zernecke, 183 U. S. 582.) Even in the case of existing corporations, the corporate existence of all those created since the Constitution of 1846 may be revoked by the legislature, though the property rights of such corporations and their special franchises other than the one to be a corporation cannot be impaired. (Const. art. VIII, § 1; Lord v. Equitable Life Assur. Socy., 194 N. Y. 212.) The property and franchise would have to be managed by the owners as partners or tenants in common, and the legislature might require as a condition of the continued right to be a corporation that before the expiration of a reasonable period the provisions of the statute should be accepted also by them. They are in the condition of a tenant at will who, when the landlord raises the rent, must either comply with his terms or, after the expiration of a reasonable time prescribed by a notice to quit, surrender his rights under the lease. But individual citizens, following the ordinary vocations of life, asking no favors of the government, whether a corporate or other franchise, but only the protection of life and property, which every government owes to its citizens, and guilty of no fault, cannot be compelled to contribute to the indemnity of other citizens who, by misfortune or the fault of themselves or others, have suffered injuries, except by the exercise of the power of taxation imposed on all, at least all of the same class, for the maintenance of public charity. Of course, I am not now referring to obligations springing from domestic relations.

CULLEN, Ch. J., GRAY, HAIGHT, WILLARD BARTLETT, CHASE and COLLIN, JJ., concur with WERNER, J.; CULLEN, Ch. J, also files an opinion, with whom WILLARD BARTLETT, J., concurs.

Judgment reversed, etc.