BATSON–MILHOLME CO. v. FAULK.
(No. 7632.)

(Court of Civil Appeals of Texas. Galveston. Dec. 15, 1918. Dissenting Opinion, March 13, 1919.)

1. MASTER AND SERVANT ⬤≈358—WORKMEN'S COMPENSATION ACT—APPLICABILITY.

In view of the Amendment of 1917 (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246–1 to 5246–91), held that where an employer, which became a subscriber under the Workmen's Compensation Act of 1913 (Vernon's Sayles' Ann. Civ. St. 1914, arts. 5246h–5246zzzz), failed to give the written notice to employés provided for by section 19, pt. 3, the statute was not binding on an injured employé who had no notice that the employer had adopted the act.

2. MASTER AND SERVANT ⬤≈286(7, 8)—INJURIES TO SERVANT—CARE.

A master cannot, as a matter of law, be said to be exercising ordinary care merely because he uses methods and appliances customarily employed by others in the same character of work, nor yet to be without such care solely because he fails to adopt the latest and most approved devices known, but the question in such cases is for the jury.

3. APPEAL AND ERROR ⬤≈1050(1)—HARMLESS ERROR—ADMISSION OF EVIDENCE.

A party cannot complain of the admission of evidence where other evidence of the same character was elicited without objections.

4. MASTER AND SERVANT ⬤≈278(16)—INJURIES TO SERVANT—EVIDENCE.

In an action by an employé of an oil company who was hurt by a falling pulley, evidence

*held* to warrant a finding that the master was negligent in failing to examine the pulley, etc.

**5. DAMAGES ⊙⇒134(1)—PERSONAL INJURIES—MEASURE OF DAMAGES.**

An award of $10,000 in favor of a strong healthy man 31 years old, earning $90 a month, who was injured so severely that he was unable to work at all for a period of nine months, and thereafter able to do only light work, his right shoulder and arm being permanently impaired, *held* not so excessive as to warrant the verdict being set aside.

Pleasants, C. J., dissenting.

Appeal from District Court, Harris County; Henry J. Dannenbaum, Judge.

Action by C. E. Faulk against the Batson-Milholme Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Harry P. Lawther, of Dallas, for appellant.

Woods, King & John, of Houston, for appellee.

GRAVES, J. The appellee, Faulk, an oil field worker, sued his employer, the appellant company, at common law for damages alleged to have resulted to him from its negligently permitting a sheave, or pulley, to fall upon him from the top of one of its derricks, at the bottom of which he was working.

Appellant responded, first, with a plea in abatement of his suit because of his failure to make the Texas Employers' Insurance Association a party defendant, alleging that at the time of the injury it was a "subscriber," under the terms of the Texas Employers' Liability or Workmen's Compensation Act of 1913 (chapter 179, General Laws of the 33d Legislature [Vernon's Sayles' Ann. Civ. St. 1914, arts. 5246h–5246zzzz]), had complied with all the requirements thereof, including provisions for payment of the compensation therein designated to its injured employés by taking out insurance for that purpose with the association named, and that it had given Faulk notice of such arrangements prior to his injury. Its further answers consisted of demurrers, denials—in particular of the acts of negligence charged—and a plea of assumed risk upon Faulk's part of a known danger.

The court submitted the cause to a jury upon special issues embodying inquiries as to whether or not appellant had been negligent as charged, whether Faulk had actual knowledge prior to receipt of his injuries that appellant had taken out the insurance it claimed to have done, and as to what sum of money, if paid then, would adequately compensate appellee for any injuries he was shown to have received.

Among its answers, the jury having found that appellee did not, prior to receipt of his injuries, have actual knowledge that his company had provided for payment of compensation to its injured employés under the liability act, the court overruled the plea in abatement, and then entered judgment against the company in appellee's favor for $10,000 damages, found by the jury to have been sustained by him as a result of appellant's negligence. This appeal proceeds from that judgment.

[1] It is first very earnestly and ably contended that the court below erred in so overruling the plea in abatement, notwithstanding the jury's finding that no prior notice had been given Faulk that appellant had insured its employés as provided in this Liability or Compensation Act of 1913, because, it is insisted, under the proper construction of that act, no such notice was necessary or a prerequisite to so bringing Faulk's cause of action, if any he had, under its terms, as to leave him without the right to sue for damages at common law, as he did; in other words, it is said that the provision for such notice in section 19, part 3, of the act in question, is directory only, and a failure upon the employer's part to observe it does not in any way abridge his right to yet require the employé to resort alone to the compensation therein prescribed.

If this construction be correct—that is, if the liability act, with its fixed schedules of compensation, superseded his right to sue for damages at common law, despite the fact that he had not been given the prescribed notice—then Faulk had no case against appellant and the plea in abatement should have been sustained.

The question is not an open one in Texas, however, having already been thrice explicitly determined adversely to appellant's contention, once each by the Courts of Civil Appeals of San Antonio, Amarillo, and Beaumont, in the order named. Kampmann v. Cross, 194 S. W. 437; Rice v. Garrett, 194 S. W. 670; Farmers' Petroleum Co. v. Shelton, 202 S. W. 194.

Appellant indulges no illusions about the effect of these holdings, concedes them to be directly counter to its view as to what our Legislature intended the effect of the required notice to be, and frankly asks this court not to follow them, but to construe the act as it does, and to reverse and render the judgment in its favor.

The practice in this court has been, when it has felt unwilling to follow previous decisions of other Courts of Civil Appeals in instances where conflicts between different ones of them did not already exist, to refrain from determining the matter in a contrary way, and thus creating a conflict, but to avoid that result by certifying the question to the Supreme Court. That course would now be followed if we were convinced

that the courts mentioned were wrong in their several and like general conclusions that the unnotified employé was not cut off from his right to sue his employer, nor remitted solely to the schedules of the compensation law; but, not so thinking, it becomes our duty to determine the issue here. Since, however, our conclusion that the right result was reached in those cases rests upon somewhat different intermediary interpretations to some there announced as to the purpose and effect of the notice provision in the statute, this expression of them is ventured, under efforts to confine it mainly to considerations not presented by the other courts, and to avoid reargument of those they have advanced.

The provision concerning notice referred to, that of the act of 1913, § 19, pt. 3, is this:

"Every subscriber shall, as soon as he secures a policy, give notice, in writing or print, to all persons under contract of hire with him, that he has provided for payment of compensation for injuries with the association."

What at that time was the object of, the purpose in, and the reason for this requirement?

As applied to a case of the character here developed, did the Legislature intend by this provision merely to require the employer to furnish his employé such concrete information as would enable the latter to obtain and reduce to possession the compensation which might thereafter become due him under a compulsory law, to which both of them, in consequence of the employer's having qualified as a subscriber thereto by paying the prescribed insurance premium, had already become unconditionally amenable, as appellant in effect contends, or did that body in the purpose to adopt, to a degree at least, an elective act, intend to impose upon the employer such a duty toward the employé as might, in the event of its nonperformance, be so penalized against the former as to leave to the latter unimpaired his pre-existing right of action for damages, if he chose to exercise it? The power of the Legislature to have done either, under the opinion of our Supreme Court in the Middleton Case, 108 Tex. 96, 185 S. W. 556, now seems established, so that the inquiry is limited to which one of the two it did, or, more properly, to which it intended to do; accordingly it is thought that a very brief reference to the nature and history of the enactment will aid in furnishing an answer.

While the atmosphere about it is much clearer now after five years of operation under it, the fact must not be overlooked that the act before us, that of 1913, was the first try-out in Texas of this new system of compensation for injury without reference to negligence upon anybody's part; and it is not unthinkable that our Legislature, in the initial adoption of it to supersede the long-prevailing right of action for damages, regarded as the legitimate penalty for negligence, was feeling its way somewhat slowly at first, and to a degree at least hesitating to bring about in all of its drastic details so radical a change in the rule of liability for personal injuries in industrial accidents as the compensation plan necessarily wrought; all the more is this supposable when it is recalled that both before and after the passage of this first legislative experiment with the new theory there was such widespread and persistent question made about its constitutionality as to bring it quite soon before the appellate courts for a settlement of that doubt. Middleton v. Tex. P. & L. Co., 178 S. W. 956, and 108 Tex. 96, 185 S. W. 556. Indeed, the chief ground of challenge of its constitutionality—and that upon the initiation of a member of the employé class—was its abrogation of a preexisting and familiar rule of liability in its denial to those engaged in the service of a subscribing employer who had complied with all its requirements of a common-law action for damages. Middleton's employer had not only in other respects, but also in actually giving him the prescribed notice, complied fully with the terms of the law; yet he still contended that because the act was compulsory as to him, and took from him, nolens volens upon his part, his common-law remedy, at the option of his employer, it invaded his constitutional rights; and the Court of Civil Appeals sustained his contention (178 S. W. 956), which, however, the Supreme Court subsequently overruled (108 Tex. 96, 185 S. W. 556).

Are we, then, permitted to assume that the Legislature, when coming to act on a measure embodying a wholly new policy of such far-reaching and revolutionary effect upon pre-existing remedies, though mindful that wide-spread discussion and serious question was then agitating the people of the state as to its constitutionality in the very particulars that were later so presented to and passed upon by the courts in Middleton's Case, was entirely uninfluenced thereby? We think not, but rather that, responding to all these considerations, and uncertain then of the exact length to which it was permitted by our Constitution to go, especially in the matter of absolutely and unconditionally compelling all persons of both classes affected by it to submit themselves to its provisions, our Legislature was proceeding with caution and intending, as the Amarillo Court of Civil Appeals says in the Rice v. Garrett Case at page 671 of 194 S. W., "to adopt an elective act." In fact, we are not without some historical data strongly suggestive of this very purpose, furnished by the able and distinguished attorney for this appellant himself, the Hon. Harry P. Law-

ther, in a masterful address upon the constitutionality of the act here under review before the Texas Bar Association in 1915. After reviewing and discussing a number of the earlier elective or optional compensation acts of different American states, he there said:

"These so-called 'optional statutes' were the result of constitutional scruples and fears engendered by the decision in Ives v. South Buffalo Ry. Co., supra (201 N. Y. 271, 94 N. E. 431, 34 L. R. A. [N. S.] 162, 23 A. & E. Ann. Cases, 156). As before stated, they will be found upon investigation to be optional in name only; and are simply instances of legislative legerdemain, whose purpose, to use a homely phrase, was to 'whip the devil around the stump.' In my opinion, statutes of this character, in name as well as in fact, should be compulsory upon all affected by them, as are all other statutes."

See page 161, Proceedings Texas Bar Association, 34th Annual Session, 1915.

It may be that the learned advocate was right in saying that different Legislatures in giving homeopathic rather than heroic doses of the compensation cure to their patients, the people for whom they were legislating, were merely "whipping the devil around the stump," and should have made all such statutes compulsory in every respect; but does he not himself present convincing proof that they did not? Elsewhere in the same address (Bar Association Proceedings 1915, p. 149), referring to the opinion of the New York Court of Appeals, which in the Ives Case had held the compensation statute of that state unconstitutional, he says:

"This opinion of the New York Court of Appeals was accepted in that state, and the Constitution changed to meet the decision. The gist of it was that the plan proposed was violative of the constitutional provision guaranteeing to the citizen the equal protection of the laws, and prohibiting the taking of his property without due process of law; for the reason that, under the provisions of the act, the property of the employer was taken from him without fault on his part, and was also taken to pay the obligations of other employers."

Of course, what we are concerned with is not what should have been, but what was in fact intended to be, done; and if the Legislatures of other states in the experimental stages of the adaptation of this European plan to American conditions, and to as many different constitutions as there were states trying it, were at first unwilling to impose its extremes, why should the Legislature of Texas not be credited with a like hesitancy? Indeed, our act itself furnishes one direct instance of not applying all features of the scheme to the exclusion of every right under pre-existing law in its retention in section 5, pt. 1, notwithstanding that the employer may be a subscriber who has given the consequent notice that he is such, of the right in the surviving spouse and heirs of a deceased

employé, whose death is caused by homicide through the willful act or omission of his employer, to recover exemplary damages in an action at law. If, therefore, the full effect of the system was not visited in one instance, nor a formerly obtaining right to sue for exemplary damages taken away, why should the conclusion seem unreasonable that the lawmaking body intended to stop short in another respect also, and to leave unimpaired his former rights through suit, if any he had, to such employé as had not been favored with the notice. And we think that is precisely what is intended by the notice provision quoted; that its plain purpose is to protect the employé who, but for the operation of the Compensation Act, would have a cause of action for damages at common law; that is, where his injuries have been proximately caused by his employer's negligence, and operates as a condition precedent to the employer's appropriation of the full benefits accruing to him under the act. Should he neglect or omit giving it, then he simply sleeps upon his rights, or fails to live up to his complete privileges, to the extent that he thereby needlessly leaves himself open to suits for damages on the part of such unnotified employé.

Nor is it any sufficient answer to this view of the effect of his failure to comply to say, as the employer here does, that he has, in the premiums paid for insurance proportionate to the total number of his employés, relieved himself from all such liability to any of them, no matter how situated, because, in the language of Chief Justice Phillips in the Middleton Case, 185 S. W. at page 559: "A Legislature may in proper instances prescribe duties and penalize their breach through an authorization for the recovery of consequent damages."

In other words, having the undoubted power to take away entirely the right of an injured employé to sue as at common law, as the opinion quoted from so ably demonstrates, the Legislature was clothed with equal authority to take it away upon such conditions as it saw fit to impose, and to require the employer not only to become a subscriber within the specified meaning of that term, but also to give the prescribed notice, before he could shut his employé, who otherwise possessed it, off from the right to hale him into court in a suit for damages.

The status of such an employé, upon the other hand, is so far fixed by the notice that after its receipt he is deprived of his otherwise existing right to sue for damages, and as a consequence can thereafter escape the resulting effect of the Compensation Act in that respect only by leaving the employment of a subscriber who has thus complied with all its requirements.

It seems to be generally conceded by members of the bar and of the courts that this legislation was enacted at the behest, and

primarily for the benefit and relief, of those engaged as employés in the various industrial pursuits throughout the state; indeed, the emergency clause appended thereto so recites. Upon that as an assumed fact, together with a likewise generally accepted statistical estimate that only about 18 per cent. of all injured employés become such as the result of their employer's negligence, leaving, therefore, 82 per cent. who at common law would have no right of recovery, appellant builds what we consider an effective argument against the soundness of the San Antonio court's conclusion in the Kampmann Case, 194 S. W. 437, supra, that the giving of notice is a necessary condition precedent to bringing either employer or employé within the law at all. The idea presented is that the Legislature, in so avowedly passing a statute for the benefit of employés as a class, could neither be presumed to have lacked the knowledge everybody else concerned possessed, that the new system would leave without its pale 82 per cent. of all those it was especially designed to protect, nor with such knowledge to have intended to deny its advantages to such an overwhelming majority of the very ones the law was passed to accommodate. We cannot, therefore, agree with that court when it says: "The printed or written notice to the employé is the condition precedent to the benefits of the bill being appropriated by the employer;" nor again when it declares in (8) of its opinion, at page 440 of 194 S. W.: "So far as the employé who has not been notified is concerned, the employer is not a subscriber. The notice creates the relation of subscriber employer and employé, and without the notice the relation cannot exist."

As before indicated, we do not think the giving of the notice by the employer a condition precedent to bringing the employé within the terms of the act at all; that is, to starting it in operation as between them, the employer having otherwise availed himself of its provisions; but that performance by him of the affirmative act of becoming a subscriber by payment of the specified premium, required of the employer by section 1, pt. 4, without any act on the part of the employé, puts the statute into effect, and covers the employé, except that the one who before had that right is not thereby deprived of his still subsisting privilege of suing for damages, unless and until the notice requirement also is met by his employer.

While thus agreeing to the extent stated with appellant's criticism of the quoted portions of the San Antonio court's opinion, it follows from the mere statement of our construction that no such result would ensue as appellant insists would flow from that court's conclusion, to wit, that 82 per cent. of all intended beneficiaries of the act— that is, those whose injury or death did not proceed from their employer's negligence—

would be left unprotected, destitute, and a charge upon the state.

It may be freely conceded that the Ultima Thule of this legislation was the good or interest of the state, or, to again quote from the Bar Association address of appellant's counsel:

"The purpose of the act is a public one, with incidental benefits to the wageworkers as a class, in that it provides for compensation for all injuries received by them in the course of their employment, without regard to the fault of the person causing the injury; but the means of paying this compensation had to be provided. The act provides for its payment out of a fund which is created by contributions from employers in the way of premiums paid for policies of insurance. In order to afford immediate relief to the injured workingman or to his dependent beneficiaries in case of death, it is necessary that these contributions should be readily and speedily made. It is obvious that this result can be better obtained by voluntary action on the part of the employers rather than by involuntary obedience to a direct command. In order to render this action voluntary, it was necessary, notwithstanding the act took from the employer his property without fault on his part and to pay the obligation of other employers, to yet make it to his interest and advantage to accept its provisions. This was done by the enactment that if he refused to accept its provisions and stood on his rights at common law, he was deprived of all his common-law defenses. In other words, in the language of Mr. Justice Holmes, the act 'brought about, by the creation of motives less compulsory than command and disadvantages of holding aloof less peremptory than an immediate stop,' the same result that it might have compelled by direct command." Proceedings Texas Bar Association 1915, p. 158.

And it may further be that in a sense this compensation theory had its roots in the rich soil of the common law of Europe, and grew out of the gradual realization that 100 per cent. of all those injured in industrial accidents instead of much less than 20 per cent. ought to be compensated; and that since ultimately the people—the consumer—paid for the injury anyway, the charge might as well, and much more justly to the employer and employé alike, be at once laid upon the industry itself as a kind of a necessary expense of operation, and in that form passed on to society, where alone it had finally to be liquidated, as was so ably argued before the Bar Association of Texas in 1917 by Hon. T. H. McGregor, formerly chairman of the Texas Industrial Accident Board (Texas Bar Association Proceedings 1917, vol. 86, p. 180). Still it is also true, according to the same authority, that the first crystallization of the plan into a statute was the act passed by the imperial government of Germany in 1884— a government under which in literal truth the interest of the state *was* (thank God for the privilege of now applying the past tense) paramount to such limits that from its birth the child was taught that it was the property

of and belonged to the state; whereas in this democratic country it has always been taught that all free governments among men are instituted for the benefit of the governed, and in that broad sense the government belongs to it.

Conceding, then, the inherent and even paramount "interest of the state," as appellant puts it in quoting from the dissenting opinion of Mr. Justice Brandeis, of the United States Supreme Court, in New York C. R. Co. v. Winfield, 244 U. S. 147, 37 Sup. Ct. 546, 61 L. Ed. 1049, L. R. A. 1918C, 439, Ann. Cas. 1917D, 1139, it yet may not be properly said that the Texas Legislature, while refusing to administer that interest according to such an ideal as the one referred to, failed to properly regard it in this enactment; for with us the public interest is the greatest good to the greatest number, and, as here interpreted, the purpose in this statute simply was, not only to bring the 82 per cent. then having no remedy within its protecting schedules, but likewise the 18 per cent. possessing such preexisting right, preserving to the latter the privilege of yet exercising it, in event they were left without notice of provision for them under the new law.

So that, in net result, the act takes care of 100 per cent. of those injured in industrial accidents, giving protection to the 82 per cent. who before had none, and at the same time, while putting its fixed compensation schedules instead of uncertain damages at the disposal of the 18 per cent. who were already provided for, does not compel absolute acceptance under any and all conditions, as appellant insists "the paramount interest of the state" makes inevitable, but, in the contingency of their not being so notified, leaves unimpaired to this latter class their existing right of suit; thus in effect merely conferring upon them, in the circumstances stated, a choice of remedies, either to accept the compensation benefits, or, as before, to seek in the courts an award of damages. And if that be its object and effect, can such a statute, regarded from the standpoint of the public interest, be said to be unreasonable? Is it not rather a quite moderate exercise of the power to penalize the breach of a prescribed duty?

Now, in 1917, the act of 1913 was so amended that, by express stipulation (section 3a, pt. 1, c. 103, Acts 35th Legislature 1917 [Vernon's Ann. Civ. St. Supp. 1918, art. 5246—4]), the employé, on entering upon service with an employer who was then a subscriber, would be held to have waived his right of action for damages under pre-existing law, if he did not upon his part give his employer simultaneous written notice that he claimed such right; or, if his contract of hire was made before the employer became a subscriber, then he had five days after notice to himself of such subscription within which, in turn, to give the notice of his claim.

Under the 1913 act the employé with notice had no further choice, and could not retain his common-law right by notice to his employer—that is, there was but one notice provided for, that emanating from the employer; while, under the amendment of 1917 also, this requirement must still be met, yet, after it has actually been, such notified employé may nevertheless continue holding his former right to sue by in writing advising his employer that he so intends.

Possibly this amendment may evidence a legislative construction that compliance with section 19, pt. 3, of the former act was not a condition precedent to making the law operative at all as to unnotified employés, but cannot, we think, be said to reflect the view that a properly situated one was not thereunder entitled to notice before being deprived of his then existing right of suit, for this reason:

The present law, while going a step further than was probably before thought permissible, in putting such an employé automatically and unconditionally under the act after his employer has become a subscriber, thereby modifying to that extent the effect of the notice still required of the latter, yet expressly takes cognizance of the former's common-law right, and in effect says that in all cases where employers are already subscribers it may be retained by the employé's giving notice for that purpose, and will be anyway for five days after notice to him of a belated subscription by an employer who had not made one when the contract of hire was entered into.

In other words, the Legislature of 1917, knowing, from our Supreme Court's deliverance in the Middleton Case, what the one of 1913 did not, that it could make the compensation statute compulsory upon all affected by it without destroying any fundamental right, as appellants' counsel says should have been done at first, did that very thing in this self-functioning section 3a of the amendment of that year, with the single proviso that the employé might himself avert that effect by giving the written notice required of him.

The amendment, therefore, seems to us a recognition that, under the unilateral provision of the first law, the employé having an outside cause of action was entitled to the prescribed notice before being shorn of it, and was intended to bring about what the Legislature considered a needed change in that respect—that is, to restrict the formerly unqualified elective features as to such an employé, and strongly to persuade, if not quite to compel, all of his class to come under the compensation plan. Especially does this appear probable in view of the further and concluding condition appended in the amendment, that, if still claimed at all, the outside cause of action will be subject to all the old common law and statutory defenses. See

final paragraph section 3a, pt. 1, amendment to chapter 179, 35th Legislature 1917.

Neither, in our opinion, do the recitations of sections 4a and 6, pt. 2, of this 1913 act, relating, respectively, to giving of notice of injury by employés to the association or the subscriber before proceeding for compensation thereunder, and to placing of employés of independent or subcontractors upon the same basis as to its benefits with those of subscribers, inveigh against the conclusion that there was a further and more substantial purpose in section 19, pt. 3, in so far as it affected employés having a prior right of suit for damages, than mere information that payment of compensation had been provided for with the association, because, by their explicit terms, these two sections in part 2 merely relate to liability for compensation, and only affect those prosecuting claims therefor, under the provisions of the act; hence in no way indicate that all employés, without reference to status, must accept that arrangement as their only recourse.

Appellant cites the recent case of Zancanelli v. Central Coal & Coke Co., 25 Wyo. 511, 173 Pac. 981, wherein the Supreme Court of Wyoming upholds the constitutionality of the Compensation Law of that state —no other question being involved—not as having any bearing upon the effect of the notice provision in our Texas act of 1913, but upon the general scheme and purpose of such legislation. It has been read with interest, but confirms our view that back at that time our Legislature must have suffered from the "constitutional scruples and fears" appellants' counsel says induced the various elective statutes of different states, before elaborated. The people of Wyoming, after a state-wide agitation and discussion of it, had just adopted an amendment to their ·Constitution incorporating the full compensation system into their organic law, and specifically commanding the Legislature to pass such a law putting it into effect, as that—

"The right of each employé to compensation from such fund shall be in lieu of and shall take the place of any and all rights of action against any employer contributing as required by law to such fund in favor of any person or persons by reason of any such injury or death."

The Legislature did so, expressly making the terms of the law "compulsory and obligatory upon both employers and employés coming within the provisions hereof."

Notwithstanding this direct authorization to enact it, and under facts showing that his employer had done exactly what the act required of him, Zancanelli ignored it, and sued for damages anyway, attacking its constitutionality, with the result stated. It need not be repeated that our lawmaking body in the first try-out of the scheme here had no such blazed trail before it, nor any such direct injunction to then apply its most drastic feature.

It is apparent from the views expressed that we think no error was committed in overruling the plea in abatement, and the assignments assailing that action are overruled.

[2] Under the third, fourth, and sixth assignments it is said the court erred (1) in failing to tell the jury that appellant, in the exercise of ordinary care, did not have to use the latest and most approved crown block and method of fastening the sheave thereon; (2) in not asking them whether the crown block and method of fastening the sheave thereon actually used in this instance was such as was then customarily and ordinarily used by oil well drillers in the same kind of work, and whether appellant was negligent in so using it; (3) in permitting witness Pinkard to testify that there was a device which could have been used on the crown block here that would have prevented the accident. These assignments are overruled, under the conclusion that no material error is therein pointed out. On the questions here raised the rule in Texas, as we understand the authorities, is that the master cannot as a matter of law be said to be exercising ordinary care merely because he uses methods and appliances customarily employed by others in the same character of work, nor yet to be without such care solely because he fails to adopt the latest and most approved devices known; but the proof upon both these matters, along with other testimony upon the issue of negligence or the freedom from it, is admissible, and that it is still left to the jury to say, from all the evidence, whether or not, in the particular circumstances so shown, ordinary care was in fact exercised.

That rule was followed in this instance. The court first properly defined negligence and ordinary care, saying it was appellant's duty to use such care in both furnishing its employés reasonably safe áppliances with which to work and in making periodic inspections thereof, and then asked the jury to find whether or not appellant had exercised that degree of care here (1) in furnishing appellant the sheave and axle upon which the same was fitted in the crown block with which to perform his work, (2) in the matter of inspecting the sheave and axle prior to the accident, and (3) whether proper inspection would have revealed any defect therein.

Upon these issues appellee's evidence showed there was in use by others in doing like work a device that would have prevented the spindle from slipping out of its groove, and thereby have averted the accident, which appellant had not used; while the latter's evidence showed these appliances in the

manner used by it to be such as others in the same character of work customarily used—that is, the spindle was permitted to lie in an open groove in the crown block, unsecured except by the weight of the machinery itself.

Adverse answers to appellant having been returned upon each of the questions so submitted, judgment against it was properly rested thereon. Magnolia Paper Co. v. Duffey, 176 S. W. 90; Armour v. Morgan, 151 S. W. 861; Sincere v. Union Compress & Warehouse Co., 40 S. W. 326; Lyon v. Bedgood, 54 Tex. Civ. App. 19, 117 S. W. 898.

[3] Moreover, as to the testimony of Pinkard, essentially the same matters were elicited without objection from other witnesses. Mott v. Insurance Co., 154 S. W. 658; Insurance Co. v. Davis, 154 S. W. 1184; Railway v. Rogers, 156 S. W. 364.

[4] Through assignments 8, 9, and 10 it is claimed the jury's answers finding appellant guilty of negligence, in response to the three special issues set out in the preceding discussion of assignments 3, 4, and 6, the first two being answered in the negative and the third in the affirmative, were contrary to the uncontroverted evidence. The argument is that proof that the sheave became loose in its axle, permitting the axle to work out of the open groove in the crown block, and the sheave to then fall down upon appellee—which result, it is claimed, disclosed an inherent and latent defect in the manufacture of the sheave and axle not discernible by inspection—did not support the finding that appellant failed to exercise ordinary care in the furnishing and inspecting of the sheave and axle, since the negligence thus shown went rather to the manner in which these two appliances were placed upon the crown block than to the furnishing of and keeping under proper inspection such ones as were in themselves reasonably safe.

The position is thought to be untenable. Not only, in our opinion, were both the allegations of negligence in the petition and the terms of the special issues as submitted broad enough to include the way the sheave and axle were attached to or placed on the crown block, but the undisputed proof—indeed, the admissions of appellant's own servant charged with the particular duty—showed no inspection to determine whether the sheave was loose upon the axle had been made for four days before the accident, and none of any sort since early morning of the next preceding day.

Of course, if the issue of ordinary care in the matter of how the sheave and axle were placed upon the crown block was in the case, and the evidence was sufficient to justify a finding that negligence occurred in that regard—both of which suppositions we think may be affirmatively answered—then it becomes wholly immaterial whether the defect in the sheave itself was latent or not, since the uncontroverted evidence already alluded to showed that no such available method of so fastening the axle in the crown block as would have certainly prevented the accident was used.

Contention is made under the eleventh assignment that the jury's finding that Faulk had no notice, prior to his injury, of appellant's having become a subscriber under the Compensation Act, is against the overwhelming weight of the evidence. After closely examining the record, however, we cannot say that even the preponderance was against the finding. At most, there was a decided conflict upon the issue, the resolving of which is not the province of this court. The assignment is overruled.

[5] The judgment is last assailed as being excessive, and the result of passion and prejudice, because, it is said, the evidence demonstrated the injuries received to have been only temporary. But, after a careful examination of the statement of facts, we conclude otherwise, and think that, although the testimony was conflicting in some respects, there was sufficient evidence to support these findings: That appellee, at the time of the accident a strong, healthy man, 31 years old, and earning $90 per month, was so injured as a result of it that, in addition to suffering greatly all the while, he was unable to work at all for a period of nine months, thereafter only becoming able to do light service, the performance of which caused him much inconvenience and continued pain; further, that he had also incurred such permanent injury to his right shoulder and right arm as seriously impaired the future use of those members.

Under the facts, considering specially the earning capacity and the long expectancy, it cannot be properly said that an award of $10,000 would so shock the conscience of an appellate court as to justify it in setting aside a jury's finding. Freeman v. Grashel, 145 S. W. 695.

A feeling of regret affects both other members of the court that the aid and comfort of concurrence in all of this opinion on the part of the learned and experienced Chief Justice may not be had.

Finding no reversible error, the judgment has been affirmed.

PLEASANTS, C. J. (dissenting). I am unable to agree with my Associates and the several Courts of Civil Appeals, whose opinions are cited in the opinion of the majority of the court in this case, in holding that the employé of a subscriber under the Texas Employers' Liability Act of 1913 could maintain a common-law action for damages against his employer for personal injuries received in the course of his employment after the employer had become a subscriber under said act, but before the employé had received notice of the fact. It seems to me that, in or-

der to give the act the construction placed upon it by the majority, the most fundamental rules for the construction of statutes must be violated, and the well-marked boundary line between fair construction and judicial legislation obliterated. Having, after mature consideration, reached this conclusion, and believing that this disregard of the cardinal rules for construction of statutes opens the way for a dangerous encroachment by the courts upon the lawmaking power which our Constitution exclusively confers upon the legislative branch of our government, I feel constrained to respectfully dissent from the opinion of the majority, notwithstanding the fact that since the recent amendment of the statute in 1917 this exact question will not likely again arise.

Section 3, pt. 1, of the act (article 5246i, Vernon's Sayles' St.), provides:

"The employés of a subscriber shall have no right of action against their employer for damages for personal injuries, and the representatives and beneficiaries of deceased employés shall have no right of action against such subscribing employers for damages for injuries resulting in death, but such employés and their representatives and beneficiaries shall look for compensation solely to the Texas Employés' Insurance Association as the same is hereinafter provided for."

The exemption of an employer, who, in compliance with the provisions of the statute, has provided insurance for the compensation of his employés for injuries received in the course of their employment, from suit for damages for personal injuries by an employé is given unconditionally in plain and explicit language. But the majority of the court, invoking the sound and well-settled rule that in construing any part of a legislative act the whole act should be considered, and its several parts so interpreted and harmonized as to give effect to the intention of the Legislature as disclosed by the entire act, say that this provision of the act does not mean what it says, because section 19, pt. 3, of the act (article 5246x, Vernon's Sayles' St.), provides:

"Every subscriber shall, as soon as he secures a policy, give notice, in writing or print, to all persons under contract of hire with him that he has provided for payment of compensation for injuries with the association;"

and because there having been great doubt in the public mind at the time this act was passed as to whether an act which deprived an employé nolens volens of the common-law cause of action against his employer for damages for personal injuries would be constitutional, it will be assumed that the Legislature entertained this doubt, and in recognition thereof intended that the act denying the employé the right to sue his employer for damages for personal injuries should not be operative as to an employé who had not,

before his injury occurred, been given notice as directed in the provision of the act last quoted.

It seems to me that this construction of the act is wholly unwarranted. The provision for notice to the employé is merely directory, and cannot, under well-settled rules of decision, be given the effect of a mandatory statute. State v. Connor, 85 Tex. 143; Kulp v. Railey, 90 Tex. 310; Altgelt v. Callaghan, 144 S. W. 1166. It occurs in an entirely different part of the act from the provision denying an employé the right to sue a subscriber employer, and there is nothing in the context to indicate that the two provisions are related to, or dependent upon, each other. It is not necessary, in order to give effect to this requirement of notice, to regard it as a limitation upon the provision exempting the subscriber from suits for damages. I think the reasonable construction of the act is that the only purpose of the Legislature in requiring this notice was to enable the employé to comply with section 4a, pt. 2, of the act (article 5246ppp, Vernon's Sayles' St.), which provides:

"No proceeding for compensation for an injury under this act, shall be maintained unless a notice of the injury shall have been given to the association or subscriber, as soon as practicable after the happening thereof, and unless the claim for compensation with respect to such injury shall have been made within six months after the occurrence of the same; or, in case of the death of the employé, or in the event of physical or mental incapacity, within six months after death or the removal of such physical or mental incapacity."

If an employé of a subscriber under this act was kept in ignorance of the fact that his employer had become a subscriber, such employé would not know that he was required, in order to obtain compensation for injuries received by him in the course of his employment, to comply with the provision of the section of the act last quoted; and, in order to obviate the delay and complications that might be thus caused the employé in collecting the compensation due him, it is an appropriate and reasonable requirement that the employer when he becomes a subscriber shall give notice of that fact to his employés.

It being entirely consistent with the general purpose and intent of the act as a whole to accord to this requirement as to notice to the employés the purpose and effect stated, it should be given this construction rather than one which is entirely out of harmony with the general purpose and intent of the statute. As plainly indicated in the body of the act and in the emergency clause, the purpose of the statute was to change the existing law in regard to liability of employers for personal injuries to their employés, or for death resulting from such injuries, so

that employés sustaining injury in "industrial accidents" might have adequate protection. In order to provide such protection to employés of persons engaged in industrial pursuits, the employers are required to provide compensation insurance for all of their employés under penalty of being deprived of their common-law defenses against claims for damages for injuries received by the employés in the performance of the duties of their employment if they failed to provide such insurance. It greatly lessens the beneficial operation of the act to give it the construction placed upon it by the cases of Kampmann v. Cross, 194 S. W. 437, Rice v. Garrett, 194 S. W. 670, and Farmers' Petroleum Co. v. Shelton, 202 S. W. 194, which hold that the act does not become operative as to an employé who has not been given the notice required by article 5246x, above quoted. This interpretation of the requirement as to notice is not only directly contradictory of the express and unequivocal provisions of article 5246i, but is so out of harmony with the general purpose and intent of the act, and would cause it to operate so unfairly and unequally upon those for whose benefit it was passed, that my Associates decline to adopt such construction. It seems to me that the construction given the act by the majority opinion in this case is hardly less obnoxious to rule of equality and uniformity than that given in the opinions cited. There is nothing in the language of the act which suggests, nor is there any reason for supposing, that the Legislature intended by this act to say that an employé who had received notice that his employer had obtained accident insurance for his benefit could look only to the insurance company for compensation for any personal injury he might receive, but an employé of the same employer, doing exactly the same kind of work, who had not received such notice, could hold the insurance company or his employer liable as he might elect, or as the circumstances under which he was injured showed the injury was due to his own or his employer's negligence.

The only reason offered by the majority opinion for attributing this intention to the Legislature is the supposed general doubt in the minds of the Legislature of its constitutional right to abrogate the rule of the common law which gives to an employé a right of action against his employer for damages resulting from personal injuries. We have no means of knowing how prevalent this doubt may have been, nor to what extent it may have affected the minds of the Legislature. We do know, however, that there was very little foundation for such doubt, because it had been held by courts of the highest authority, both before and since the passage of this act, that no one has a vested interest in the rules of common law themselves. If a property right has vested under a common-law rule, such right cannot be destroyed by a change in the rule, but it is entirely competent for the Legislature to change or repeal such rules. Middleton v. Texas Power & Light Co., 108 Tex. 96, 185 S. W. 556.

One cannot read the majority opinion in this case, nor the opinions cited to support it, without reaching the conclusion that the controlling idea in the mind of the court was that the common-law right of action could or should not be taken away from the employé without his consent; and therefore unless the notice required by the statute was given, and the employé after receiving such notice remained in the service, he should not lose his common-law right of action. With this idea uppermost in their minds, they attribute an intention to the Legislature, in enacting the provision as to notice, which is not only not evidenced by anything in the language of the act, but contrary to its express provisions and its general purpose and intent. In other words, they unconsciously give the act a meaning in conformity with what they think the law ought to be, in disregard of what the Legislature said it should be. In order to give the act this construction, the majority opinion goes outside of the act, and bases its holding upon the assumption that the Legislature doubted its power or right to take from an employé without his consent, the common-law right of action for damages resulting from personal injuries, and therefore intended that the act should not have this effect as to an employé who had not been given the required notice. This is not a permissible method of construing a legislative act. If the meaning and intention of the Legislature can be ascertained from the act itself, and all of its provisions harmonized and given effect, it is not permissible to resort to other means of interpretation. Even if the court is satisfied that the Legislature meant something not expressed in the act, it cannot depart from the plain meaning of the language, and give effect to such unexpressed intent. To follow any other rule of construction would be the usurpation by the courts of the legislative function.

The rule of construction which I think should be followed in interpreting this statute is thus clearly stated in the case of Alexander v. Worthington, 5 Md. 485:

"The language of a statute is its most natural expositor; and, where its language is susceptible of a sensible interpretation, it is not to be controlled by any extraneous considerations. The construction is to be on the entire statute, and where one part is susceptible indifferently of two constructions, and the language of another part is clear and definite, and is consistent with one of the two constructions of which the former part of the statute is susceptible, and is opposed

to the other construction, then we are to adopt that construction which will render all clauses of the statute harmonious, rather than that other construction which will make one part contradictory to another. Where the letter of the statute is inconsistent with itself, we may eviscerate an intent by considering the mischief existing and the remedy proposed to be introduced. * * * We are not at liberty to imagine an intent, and bind the letter of the act to that intent; much less can we indulge in the license of striking out and inserting, and remodeling, with the view of making the letter express an intent which the statute in its native form does not evidence. Every construction, therefore, is vicious which requires great changes in the letter of the statute, and of the several constructions that is to be preferred which introduces the most general and uniform remedy."

It is never permissible to give a provision of a statute a different meaning from that plainly expressed by its language unless such meaning is contradicted by other plainly expressed provisions, or is repugnant to the general purpose and intent of the statute considered as a whole.

We cannot create a conflict in the provisions of a statute by giving any of its provisions a meaning not required by its plain and unambiguous language. Sutherland on Statutory Construction, pars. 237 to 241, inclusive, and cases there cited.

It follows from the views above expressed that I am of opinion that the judgment of the court below should be reversed, and judgment here rendered for appellant.