Matter of McLaurin v New York City Tr. Auth. (2025 NY Slip Op 06529)

Matter of McLaurin v New York City Tr. Auth.

2025 NY Slip Op 06529

Decided on November 24, 2025

Court of Appeals

Troutman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 24, 2025

No. 88 
 
 

[*1]Kimberly McLaurin, Respondent,
v
New York City Transit Authority, Appellant. Workers' 
 Compensation Board, Respondent. No. 89
In the Matter of the Claim of Sheldon Matthews, Respondent,
v
New York City Transit Authority, Appellant. Workers' Compensation Board, Respondent.
No. 90 
In the Matter of the Claim of Melissa Anderson, Respondent,
v
City of Yonkers, Appellant. Workers' Compensation Board, Respondent.
No. 91 In the Matter of the Claim of Bolot Djanuzako Respondent,
v
Manhattan & Bronx Surface Transit Operating Authority, 
 Appellant. Workers' Compensation Board, Respondent.

Case Nos. 88, 89 & 91:
J. Evan Perigoe, for appellant.
Geoffrey Schotter, for respondents Kimberly McLaurin, Sheldon Matthews, Bolot Djanuzakov.
Andrea Oser, for respondent New York State Workers' Compensation Board.
Injured Workers' Bar Association, amicus curiae.
Case No. 90:
Ralph E. Magnetti, for appellant City of Yonkers.
Geoffrey Schotter, for respondent Melissa Anderson.
Andrea Oser, for respondent New York State Workers' Compensation Board.
American Property Casualty Insurance Association, Injured Workers' Bar Association, amici curiae.

TROUTMAN, J.

Claimants, three transit workers and one teacher, filed for Workers' Compensation Law benefits in 2020, alleging psychological injuries—e.g., posttraumatic stress disorder (PTSD)—resulting from workplace exposure to COVID-19. The Worker's Compensation Board (Board) found that claimants were exposed to similar stress as their coworkers. The Board thus affirmed the disallowance of the claims because claimants failed to demonstrate that the stress they experienced constituted a compensable "accident" within the meaning of the Workers' Compensation Law.
The Appellate Division reversed the decisions, concluding that they were inconsistent with Matter of Wolfe v Sibley, Lindsay & Curr Co. (36 NY2d 505 [1975]), where we held that " 'psychological or nervous injury precipitated by psychic trauma is compensable to the same extent as physical injury' " (Matter of Anderson v City of Yonkers, 227 AD3d 63, 65 [3d Dept 2024], quoting Wolfe, 36 NY2d at 510). According to the Appellate Division, the Board erred (1) in failing to consider each claimant's "particular vulnerabilities" (id. at 68-70), and (2) in "appl[ying] disparate burdens to claimants seeking benefits for contracting the virus—a physical injury—as compared to those seeking benefits for psychological injuries alleged to stem from exposure to the virus in the workplace" (id. at 71-73).[FN1] Concerning the purported "disparate burdens," the Appellate Division observed that, under the Board's "prevalence [*2]rule," claimants seeking benefits for contracting the virus may meet their burden to show that " 'an injury arose in the course of employment by demonstrating either a specific exposure to COVID-19 or prevalence of COVID-19 in the work environment so as to present an elevated risk of exposure constituting an extraordinary event' " (id. at 71, quoting Matter of Holder v Office for People with Dev. Disabilities, 215 AD3d 1201, 1202 [3d Dept 2023]). The Appellate Division ruled that the Board must also apply this "special rule" to claimants seeking benefits for "psychological injuries from exposure to COVID-19" (id. at 72-73). We reverse and reinstate the decisions of the Board.
The Board is not required to consider each claimant's "particular vulnerabilities." In holding that emotional stress-induced psychological and physical injury are "compensable to the same extent," we explained that
"there is nothing in the nature of a stress or shock situation which ordains physical as opposed to psychological injury. The determinative factor is the particular vulnerability of an individual by virtue of his physical makeup. In a given situation one person may be susceptible to a heart attack while another may suffer a depressive reaction. In either case the result is the same—the individual is incapable of functioning properly because of an accident and should be compensated under the Workers' Compensation Law" (Wolfe, 36 NY2d at 510 [emphasis added]).
The expression "determinative factor" does not refer to a factor in a legal test for determining whether an accident occurred but instead to a factor in a psychophysiological process that determines what type of injury results from exposure to emotional stress. Our point was that, where a workplace accident causes a debilitating injury, there is no reason to treat a claimant whose vulnerability causes a psychological injury differently from one whose vulnerability causes a physical injury. Thus, claimants' particular vulnerabilities are immaterial to the merits of their claims.
Nor did the Board apply disparate burdens to the claims here as opposed to COVID-19 contraction claims. While psychological and physical injury are "compensable to the same extent" (id.), neither is compensable unless the claimant satisfies the separate elements that the injury was "accidental" and that it "ar[ose] out of and in the course of employment" (Workers' Compensation Law § 2 [7]; see id. § 10 [1]). At the time of the Board's decisions, emotional stress-induced psychological injury was considered accidental only if the claimant established that the stress they experienced in the workplace was " 'greater than that which other similarly situated workers experienced in the normal work environment' " (Matter of Lozowski v Wiz, 134 AD3d 1177, 1178 [3d Dept 2015]; see Matter of Block v Stroheim & Romann, 203 AD2d 833, 834 [3d Dept 1994]; Matter of Santacroce v 40 W. 20th St., 9 AD2d 985, 985 [3d Dept 1959], affd 10 NY2d 855 [1961]; see also Matter of Leggio v Suffolk County Police Dept., 96 NY2d 846, 847 [2001]; Matter of Kaliski v Fairchild Republic Co., 151 AD2d 867, 867 [3d Dept 1989], affd for the reasons stated below 76 NY2d 1002 [1990]). By disallowing the claims on that ground, the Board, in effect, concluded that claimants had failed to establish that the injuries were accidental. Because the injuries were nonaccidental, it is of no moment that the injuries may have arisen "in the course of employment" (Holder, 215 AD3d at 1202; see Workers' Compensation Law §§ 2 [7]; 10 [1]; Matter of Aungst v Family Dollar, — NY3d &mdash, — [2025] [decided today]), and thus the "prevalence" rule is no help to claimants.
To put it another way, evidence of COVID-19's prevalence in the workplace does not relieve a claimant of the burden to establish that the injury was accidental which, in cases of emotional stress-induced psychological injury, has involved a demonstration by the claimant of stress greater than the stress experienced by similarly situated workers in the normal work environment. Here, substantial evidence supports the Board's determination that the stress of workplace exposure experienced by claimants was comparable to the stress experienced by similarly situated workers in the normal work environment during the COVID-19 pandemic (see Leggio, 96 NY2d at 847).
Neither our decision today nor the approach of our dissenting colleagues could be expected to have a significant impact on the development of the law. After the Appellate Division decided these appeals, the legislature amended the Workers' Compensation Law to provide that the Board "may not disallow a claim" for PTSD, acute stress disorder, or major depressive disorder "upon a factual finding that the stress was not greater than that which usually occurs in the normal work environment" (Workers' Compensation Law § 10 [3] [c]). By amending the statute in this manner, the legislature has determined that claims of psychological injuries should be evaluated under a [*3]standard more favorable than even the dissent's novel standard.[FN2] Claimants do not argue that the newly amended language applies retroactively to the Board decisions, which predate the effective date of the legislation.
The fact that the Board "does not object" to the dissent's approach is, as the dissent acknowledges, "unusual" (dissenting op at 7). The Board enjoys "very wide latitude in determining whether a disabling condition is an accident" (Matter of Johannesen v New York City Dept. of Hous. Preserv. & Dev., 84 NY2d 129, 134 [1994]; see Matter of Middleton v Coxsackie Correctional Facility, 38 NY2d 130, 135 [1975]). It is peculiar practice indeed for the Board to disallow claims on the ground that the claimants' conditions are nonaccidental but fail to take a position as to whether the appellate courts should uphold its own decisions. We do not encourage the practice.
Accordingly, in each case, the order of the Appellate Division should be reversed, with costs, and the decision of the Workers' Compensation Board reinstated.

HALLIGAN, J. (dissenting in part):

I agree with the majority's explanation of the errors in the Appellate Division's decision. But in my view there is a path here for the claimants to obtain benefits. The Workers' Compensation Board tells us that it had "felt constrained" by precedent to deny benefits because the claimants had not shown workplace stress which exceeded stress experienced by similarly situated workers, but now recognizes "a reasonable argument" for treating stress during the early stages of the COVID-19 pandemic as "extraordinary." The majority appears to agree with the Board's initial understanding (majority op at 4, 5). I do not read the Workers' Compensation Law or relevant caselaw so narrowly.
As the majority notes, at the time of the Board's decisions, a claimant was required to establish stress "greater than that which other similarly situated workers experienced in the normal work environment" (majority op at 4). I [*4]believe we can construe that standard as encompassing these claimants, and that we should do so given the extraordinary circumstances of the COVID-19 pandemic, particularly in its early stages—a time when many New Yorkers were falling seriously ill and dying, and testing, prevention, and treatment options were exceedingly limited. To that end, I would confirm that in these cases the Board can frame the "similarly situated" inquiry in temporal terms; that is, whether stress experienced by public-facing workers during the early stages of the pandemic was greater than stress experienced by similarly situated workers in a normal work environment prior to the pandemic.
The "normal work environment" standard finds roots in Matter of Santacroce v 40 W. 20th St., Inc. (9 AD2d 985 [3d Dept 1959]). There, an elevator operator died of heart failure after arguing with the building superintendent. The Appellate Division denied workers' compensation benefits, concluding that the situation was not "so 'exceptional' " as to constitute a compensable accident (id. at 985). Central to its holding was the determination that the claim "neither involve[ed] nor induc[ed] emotional strain or tension greater than the countless differences and irritations to which all workers are occasionally subjected without untoward result" (id.). This Court affirmed without an opinion (see 10 NY2d 855 [1961]).
The animating principle in Santacroce was a frank recognition that work may at times be, and indeed often is, stressful. Disagreements happen; deadlines must be met; problems must be solved. Thus, only workplace stress that is truly "exceptional" is considered accidental, and therefore compensable, under the Workers' Compensation Law. As a general matter, comparing a claimant's stress with that experienced by similarly situated workers during the same time period is a useful way to determine whether the claimant's stress was exceptional—that is, "more than that normally encountered in the workplace" (Matter of Leggio v Suffolk County Police Dept, 96 NY2d 846, 847 [2001]). But I see no reason why this particular comparison is the only option available to the Board. Instead, I would hold that amidst the exceptional challenges of COVID-19, particularly for public-facing workers, the Board can assess whether workplace stress was exceptional by comparing the stress experienced by those workers to stress experienced by the same group of workers before and after the early stages of the pandemic.
This approach finds support in our caselaw. In Schechter v State Ins. Fund (6 NY2d 506 [1959])—the case cited by the Appellate Division in Santacroce—an attorney suffered a heart attack after his caseload increased significantly during a seven-week period. We determined that this event constituted an accident because the attorney was subjected to "unusual strain and exertion in the course of his duties" over this particular stretch of time (id. at 511). The comparison was temporal, rather than measuring the claimant's stress against the stress level of other employees during the same time period. Nor did it matter that the work the attorney was engaged in was "of the same general type as that in which he [was] regularly involved" (id. at 510).
The Board could have applied similar reasoning here. The pandemic was certainly an extraordinary event. During the early stages, businesses were required to close, people were instructed to stay inside and socially distance, and health guidance warned that COVID-19 could lead to death or severe health outcomes. And yet public-facing workers like claimants were required to continue showing up to work in person, with limited options to protect themselves. Before personal protective equipment (PPE), testing, vaccines, and treatments were widely available, these employees had to run the daily risk of contracting a novel and potentially deadly disease to keep earning their paychecks. Under these circumstances, the stress that public-facing workers experienced was far greater than that which they would have typically encountered in a normal work environment before the onset of the pandemic. The stress they encountered at work was categorically different from the "countless differences and irritations to which all workers are occasionally subjected without untoward result" (Santacroce, 9 AD2d at 985).
This stress was grounded in real health risks. During the first 16 months of the pandemic, essential workers like the claimants were diagnosed with COVID-19 at a rate 25% higher than the general population (see Essential Every Day: The Lives of NYC's Essential Workforce During COVID-19, Center for Research on HOME, NYC Dept of Housing Preservation and Development at 13 [2023]). A study of New York City transit workers in particular found that they were "at increased risk for [COVID-19] infection and more likely to have risk factors for [COVID-19] related complications" (see Suzanne E Tomasi et al., COVID 19 Mortality Among Amalgamated Transit Union (ATU) and Transport Workers Union (TWU) Workers, 64 Am J Ind Med 723, 723 [2021]). And a survey found that, as of August 2020, 76% of New York City bus and subway workers personally knew someone who died from COVID-19 (see Robyn Gershon et al., Impact of Occupational Exposure to COVID-19 on the Physical and Mental Health of an Essential Workgroup: New York City Transit Workers, 19 J Emergency Mgmt 133, 139 [July 2021]).
Compensating claimants for injuries sustained due to these kinds of extraordinary workplace health risks would be fully consistent with the purpose of the Workers' Compensation Law. The Legislature first enacted the [*5]Workers' Compensation Law in 1910 in response to concerns that employees injured by workplace hazards should have the right to "prompt and certain compensation," and that the tort-based system of liability then in place "need[ed] radical change" in order to accomplish that goal (Report to the Legislature of the State of New York by the Commission Appointed Under Chapter 518 of the Laws of 1909 to Inquire into the Question of Employers' Liability and Other Matters, at 7 [1910]; see also Crosby v State of N.Y., Workers' Comp. Bd., 57 NY2d 305, 313 [1982] [the purpose of this "broad scheme of compensation" is to provide "a swift and sure source of benefits" and avoid "the delay and expense to the claimant caused by the protracted litigation involved in pursuing a negligence claim"]). The Legislature thus decided to replace tort liability with a regime that would hold an employer responsible for every accident in the course of employment, "whether the employer is at fault or not, and whether the employee is at fault or not" (Ives v South Buffalo Ry. Co., 201 NY 271, 285 [1911]).
One day after this Court invalidated that law on constitutional grounds (see id. at 317), the infamous Triangle Shirtwaist Factory fire killed 146 employees (see Robert E. Grey, The Rise and Fall of Workers' Compensation in New York, 86 Albany L Rev 713, 715-16 [2022-2023]). The fire was a galvanizing event that culminated in an amendment to the State constitution designed to allow for the enactment of a workers' compensation law (see id.; NY Const art I, § 18). As Governor John A. Dix emphasized in supporting the amendment, due to "changes in conditions of labor and the increased risks incident to many employments . . . the principle of compulsory compensation for all industrial accidents, cannot fairly be questioned" (Public Papers of Governor John A. Dix at 29 [1912]). The Legislature then re-enacted the Workers' Compensation Law. In upholding it, this Court declared that the compensation system created a "more just and economical system of providing compensation for accidental injuries to employees as a substitute for wasteful and protracted damage suits" (Matter of Jensen v Southern Pac. Co., 215 NY 514, 528 [1915]).
The crux of this history is that the Workers' Compensation Law exists to provide employees with benefits for injuries sustained at work, without regard to fault. We have described it as a "compulsory scheme of insurance" designed to protect workers against health and safety risks encountered in the workplace (id. at 526). The "underlying theory is that industrial risks are apparently inseparable concomitants of modern industrial enterprise," and any "[a]ttempt to decide who is at fault proves in most instances to be futile" (Henry R. Seager, The Future of the Workmen's Compensation Amendment, Proceedings of the Academy of Political Science in the City of New York, Vol. 5, No. 2 at 121 [1915]). Thus, the Workers' Compensation Law requires employers to "pay or provide compensation for [an employee's] disability or death from injury arising out of and in the course of the employment without regard to fault" (Workers' Compensation Law § 10). Consistent with this long-standing objective, the claimants here should be able to recover for the injuries they sustained from the extraordinary and undeniable risks they faced during the early stages of the pandemic.
I would thus remit to the Board so that it might reconsider these claims and determine whether claimants had shown that they were subjected to extraordinary stress as compared with similarly situated workers in a normal work environment pre-pandemic and whether they demonstrated the existence of psychological injuries that were causally related to workplace stress [FN1]. Notably, the Board "does not object to" this outcome. Indeed, at argument, the Board's attorney encouraged this Court to hold that stress from the risk of COVID-19 during the pandemic's early stages could qualify as a compensable injury and emphasized that such a ruling would not "open the flood gates" to a high volume of additional claims. That position is unusual absent an acknowledgment that the Board erred in denying recovery, but it does allay any concerns that ruling for claimants here would impose any significant additional liability on employers.
***
These claimants performed essential work during an immensely challenging time. While many of us were able to retreat to our homes and work remotely during the pandemic, these workers continued to perform their vital [*6]duties in person, risking their health and safety. Transit system workers quite literally kept the wheels of society turning; teachers ensured our children could continue to learn while the world shifted under their feet. When the extraordinary stress of working under conditions that involved ongoing exposure to a deadly disease caused these workers to develop serious psychological conditions, they turned to our century-old system of workers' compensation. Consistent with the purpose of the Workers' Compensation Law, I would allow these claimants to pursue their claims for benefits.
Order reversed, with costs, and decision of the Workers' Compensation Board reinstated. Opinion by Judge Troutman. Judges Garcia, Singas and Cannataro concur. Judge Halligan dissents in part in an opinion, in which Chief Judge Wilson and Judge Rivera concur.
Decided November 24, 2025

Footnotes

Footnote 1: The Appellate Division's discussion is contained in Anderson (227 AD3d at 66-74). Its decisions in the other three cases all refer to Anderson for that discussion (see Matter of McLaurin v New York City Tr. Auth., 225 AD3d 1105, 1106-1107 [3d Dept 2024]; Matter of Matthews v New York City Tr. Auth., 225 AD3d 1109, 1110 [3d Dept 2024]; Matter of Djanuzakov v Manhattan & Bronx Surface Tr. Operating Auth., 225 AD3d 1107, 1108-1109 [3d Dept 2024]).

Footnote 2: Because of the statutory amendments, it is unclear if the Board would even have the power to apply the dissent's standard if we were to remit.
Footnote 1: The majority suggests that if this Court were to remit to the Board, recent amendments to the Workers' Compensation Law, if applied retroactively, might exempt the claimants from the "similarly situated" requirement. That possibility does not obviate the issue before us, which is whether the Board erred in denying benefits under the statutory scheme then in effect. In my view, the answer is yes. On remand, the claimants could pursue their claims under the terms I propose, or under the amended statute if it were deemed applicable.